1          THE UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF FLORIDA
2          Case No. 17-CV-24206-MARTINEZ

3
     LARA GEORGE MANSOUR a/k/a          )    Pages 1-75
4    LARA SAMAHA,                       )
                                        )
5                    Plaintiff,         )
                                        )    Miami, Florida
6            vs.                        )    October 8, 2019
                                        )    10:00 A.M.
7    MONA BACH MANSOUR, individually,   )
     et al.,                            )
8
                     Defendants.
9

10          TRANSCRIPT OF EVIDENTIARY HEARING
     BEFORE MAGISTRATE JUDGE ALICIA M. OTAZO-REYES
11           UNITED STATES MAGISTRATE JUDGE

12
     APPEARANCES:
13
     For the Plaintiff:        ROBERTO VILLASANTE
14                             4000 Ponce de Leon Boulevard
                               Suite 470
15                             Coral Gables, Florida  33146

16
     For certain Defendants:   JESSICA A. MASELLA and
17                             HAROUT JACK SAMRA
                               DLA Piper
18                             1251 Avenue of the Americas
                               New York, New York  10021
19

20

21

22   Reported By:              VERNITA ALLEN-WILLIAMS
     Vernita_Allen-Williams    Official Court Reporter
23   @Flsd.uscourts.gov        United States District Court
                               400 North Miami Avenue
24                             Miami, Florida  33128

25

```
 1                        INDEX OF WITNESSES
 2    LARA MANSOUR
 3               Direct Examination          Page 8
 4               Cross-Examination           Page 42
 5               Redirect Examination        Page 45
 6    ELIE SAMAHA
 7               Direct Examination          Page 46
 8               Cross-Examination           Page 57
 9                         EXHIBITS
10    Defendant's Exhibit No. 1              Page 59(not admitted)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1          THE COURTROOM DEPUTY:  Lara Mansour, et al., vs.

2     Mansour, et al., case number 17-24206-cv-Martinez.

3          Counsel, please state your appearance for the

4     record.

5          MR. VILLASANTE:  Roberto Villasante on behalf of

6     Mrs. Mansour.

7          MS. MASELLA:  Jessica Masella, and I'm here with my

8     colleague Harout Samra from DLA Piper, for the five Lebanese

9     government official defendants.

10         THE COURT:  Thank you very much.  You may be seated

11     except when addressing the Court.  So I have plaintiff's

12     motion for relief from a judgment order pursuant to Federal

13     Rule of Civil Procedure 60.  That's a matter that was

14     referred to me by Judge Martinez.

15         I have the Lebanese government defendants; and

16     that, from what I can tell, is Salim Jreissati, Samir

17     Hammoud, Ziad Mekenna, Ziad Haidar, and Pascal Antoun.  Those

18     are the ones who subscribed the opposition, which is docketed

19     at Docket Entry 94.  And then I have the plaintiff's reply.

20         Now, I have not received any papers, Mr.

21     Villasante, from the other defendants; namely, Mona Mansour,

22     Alexander George Mansour, Rolly George Mansour, and Dany

23     George Macaron.  You have not received anything either?

24         MR. VILLASANTE:  No, Your Honor.  It is our

25     position that we are unopposed in our motion with respect to

1    those defendants.

2              THE COURT:  Okay.  All right.  Hang on just a

3    second.  You indicated that in your motion?

4              MR. VILLASANTE:  I'm not certain that we said it

5    quite like that, no.  But the defaulted defendants, those

6    that you just mentioned, have not responded and they are not

7    appearing in court today.

8              So it's our position that as to those defendants

9    that are not the Lebanese defendants whose counsel is here

10   today, there has been no opposition filed.

11             THE COURT:  All right.  So let's make sure that I

12   get the procedure straight.

13             You're saying that those -- I'll call them the

14   Mansour defendants -- those four defendants with the last

15   name Mansour, plus the defendant with the last name Macaron,

16   you're saying that default was entered against them?

17             MR. VILLASANTE:  Default was entered against them.

18   The issue is after the default, there has been a dismissal,

19   which was taken under duress and improperly.

20             THE COURT:  Right.  Right.  I'll address that in a

21   moment.

22             MR. VILLASANTE:  Right.

23             THE COURT:  I'm just trying to get the parties

24   lined up properly.

25             MR. VILLASANTE:  Yes, ma'am.

1      THE COURT:  So default was entered against those.

2    Was it a clerk's default that was entered?  Can you point me

3    to the docket entry?

4      MR. VILLASANTE:  I'll have to find it in the docket

5    entry.  But the answer is, yes, that it was a clerk's

6    default.

7      Do you mind if I sit, Your Honor, for just a

8    moment?

9      THE COURT:  Yes.  I'm scrolling through here,

10    scrolling through here.  Yes, I see it.  Clerk's entry of

11    default, I think, is Docket Entry 79.

12      MR. VILLASANTE:  Yes, Your Honor.

13      THE COURT:  As to Rolly George Mansour, Mona Bach

14    Mansour, Marlene Wadih Layoun, Fadi Wadih Layoun, Dany George

15    Macaron, Alexander George Mansour.

16      So who are these other individuals; Marlene Wadih

17    Layoun and Fadi Wadih Layoun?  They're not in the -- oh, here

18    they are.  Those are individuals also.

19      MR. VILLASANTE:  Yes.

20      THE COURT:  I see them here.  So I guess I will

21    call them the Mansour and Layoun defendants.

22      MR. VILLASANTE:  Yes, Your Honor.

23      THE COURT:  So as to all of those, default has been

24    entered and they have not appeared and are not appearing at

25    this hearing.

1          MR. VILLASANTE:  That is correct, Your Honor.

2          THE COURT:  So the motion is opposed only by the

3    Lebanese government defendants.

4          MR. VILLASANTE:  Yes.

5          THE COURT:  All right.  So we got that straight.

6    So now the motion is proceeding under Rule 60, as I can tell

7    from the heading.  And I am ready to receive any evidence

8    and/or argument that plaintiffs want to present; and then

9    I'll hear what we're calling out of convenience the Lebanese

10   defendants anything that they want to proffer.

11         MR. VILLASANTE:  Just as a preliminary matter, Your

12   Honor, I intend to call my client as a witness and her

13   husband as well.  And they will give Your Honor the testimony

14   about their detention and all the facts.

15         Before today after I filed my notice of appearance,

16   opposing counsel and I have had very cordial phone

17   conversations, we had two recently in the matter of

18   conferring about exhibits and witnesses; and until last week

19   they had represented to me that no witnesses and no

20   additional exhibits would be filed.  This morning,

21   apparently, they received an affidavit from an attorney in

22   Lebanon that purports to be in the form of an expert witness

23   affidavit.

24         And, of course, that's being given to me moments

25   before this hearing.  So I just want to preliminarily oppose

1   the introduction of that affidavit in any format because it's

2   a total surprise to me.  Clearly as an expert witness, I

3   would have to have an opportunity to depose them and look at

4   the background, et cetera.

5           THE COURT:  All right.  Mr. Villasante, we will

6   address those issues when the defendants seek to present

7   anything to the Court.

8           MR. VILLASANTE:  Yes, Your Honor.

9           THE COURT:  So we can go forward then.  The

10  plaintiff is Miss Lara George Mansour; correct?

11          MR. VILLASANTE:  Yes, Your Honor.  And we would

12  call her to the witness stand.

13          THE COURT:  And you said that Mr. Mansour is

14  intending to testify also?

15          MR. VILLASANTE:  Yes.

16          THE COURT:  Do defendants want to invoke the rule?

17          MS. MASELLA:  No, Your Honor.

18          THE COURT:  You're okay with him remaining here?

19          MS. MASELLA:  Yes, that's fine, Your Honor.

20          THE COURT:  All right.  All right.  Let's get

21  started then.

22          MR. VILLASANTE:  Your Honor, at this time we call

23  Mrs. Mansour, Mrs. Lara George Mansour.

24          THE COURT:  All right.

25          MR. VILLASANTE:  For the purposes of addressing the

```
 1   witness, may I use the podium?
 2              THE COURT:  Yes.  The podium works fine.  If you
 3   wish to, you can turn it.  You can turn it.
 4              MR. VILLASANTE:  Thank you.
 5              THE COURTROOM DEPUTY:  Raise your right hand.
 6              (Witness duly sworn)
 7              THE WITNESS:  Yes, I do.
 8              THE COURTROOM DEPUTY:  You may be seated.  Please
 9   state your full name for the record and spell your last name.
10              THE WITNESS:  My name is Lara George Samaha.
11                 LARA GEORGE SAMAHA, PLAINTIFF, SWORN
12                          DIRECT EXAMINATION
13   BY MR. VILLASANTE:
14   Q.   Miss Samaha, are you the plaintiff in this case?
15   A.   Yes.
16   Q.   Miss Samaha, what is it that you do professionally in
17   Lebanon?
18   A.   I own five stores in Lebanon for clothing.
19   Q.   Did there come a point where you filed a lawsuit in
20   Lebanon and a lawsuit in the United States?
21   A.   Yes.
22   Q.   At some point -- I'm going to take you through the dates
23   of late March through April 11th.
24              At some point when you were in the United States,
25   did there come a time when you decide to return to Lebanon in
```

1    a matter related to this lawsuit?

2    A.   Yes.

3    Q.   And approximately at the end of March, is that when that

4    took place?

5    A.   Yes.

6    Q.   What is it that prompted you to return to Lebanon on

7    that occasion?  I believe it was April 1st.

8    A.   It was on April 1st we decided to come to Lebanon

9    because --

10            Majed Bouez was supposed to be my lawyer in

11   Lebanon.  He promised us to come back because --

12   Q.   Let me stop you for one second because some of the names

13   are going to be difficult for the court reporter.

14   A.   Okay.

15   Q.   So I'm going to just, if I may, with the Court's

16   permission, you mentioned Majed Bouez?

17   A.   Bouez.

18   Q.   B-o-u-e-z?

19   A.   Yes.

20   Q.   And that was your attorney in Lebanon?

21   A.   In Lebanon.

22   Q.   And he initiated communication with you?

23   A.   Yes.

24   Q.   All right.  Please explain to the Court what happened.

25   A.   He told my husband and he told me that there was a full

1    settlement already prepared and they're going to return back
2    my money and everything would be solved.
3          So me and my husband, we decided to return back to
4    Lebanon.
5    Q.   All right.  So on April 2nd when you returned to
6    Lebanon, it was your understanding that the matter was going
7    to be settled and that Attorney Bouez had prepared the
8    necessary documentation for you to return?
9    A.   Yes.
10   Q.   All right.  Please explain to the Court what happened.
11         Did it come to pass that you went on an airplane
12   with your husband to Lebanon?
13   A.   Yes.
14   Q.   All right.  And when you arrived, please explain to the
15   Court what it is that happened on April 2nd.
16   A.   Upon my return to Lebanon, I just arrived to the airport
17   in Beirut and they just arrest me and take me into custody at
18   Beirut in the airport.
19         And they -- there was a custom border control, they
20   arrest me without any reason and they like kidnapped me and
21   put me into custody.
22   Q.   Once they detained you at the airport, what happened at
23   that point?  Were you told the nature of your arrest?  What
24   else happened?
25   A.   Nothing.  They didn't tell me anything.  They just took

1   me inside, they took my cell phone, and they told me wait a

2   little bit.

3   Q.   You're going to have to slow down for purposes of the

4   court reporter.

5   A.   I'm so sorry.

6   Q.   They took you to an office?

7   A.   They took me into custody, and they told me to take --

8   to give them the cell phone, my cell phone.  They took my

9   cell phone.

10  Q.   Okay.  For how long were you detained at the airport?

11  A.   For maybe 15 minutes, 20 minutes.

12  Q.   And at that time were you told the nature of your

13  arrest, the purpose of your arrest?

14  A.   They didn't know.  They told me:  You have to go to the

15  detention center, and they can tell you what happened.

16  Q.   All right.  And what happened next?

17  A.   There was like three army men that were holding AK-47s.

18  They came and they took me inside the military car to the

19  detention center next to the airport.

20  Q.   And what did they do with your husband at that time?

21  A.   My husband was waiting outside, and he was asking:  Why

22  are you detaining my wife?

23  Q.   And you were put into a military transport vehicle with

24  three soldiers?

25  A.   Yes.

1    Q.   And these soldiers were carrying AK-47s?

2    A.   Yes.

3    Q.   And where were you taken?  From the airport to where?

4    A.   They took me -- next to the airport there was a

5    detention center where they put all prisoners inside.

6    Q.   And when you arrived there, then what happened?

7    A.   When I arrived, they opened the door for me and they

8    took me and they put me inside a waiting room.  I was in the

9    waiting room.

10   Q.   And then next?

11   A.   And later my husband arrived and he was asking the

12   general of this detention:  Why are you detaining my wife?

13   And I was asking what was the problem.

14        So he told -- they told me that I'm arrested

15   already because of the federal lawsuit that I filed here.

16   Q.   Let me interrupt you there for one second.  Who is

17   informing you that your arrest was because of this federal

18   lawsuit that took place here in the United States?

19        With whom were you speaking that gave you that

20   information?

21   A.   The general of the detention center.

22   Q.   Okay.  And do you have -- well, go on from there.

23        What happened after he told you that you had been

24   taken under arrest because of this federal lawsuit?

25   A.   So me and my husband -- I was shaking and crying.  I

1    wasn't in a good -- I wasn't -- I was afraid.  And I asked

2    what I did.  What about the federal lawsuit?  I was crying

3    when I was waiting inside the room.

4           And after, my husband -- they forced my husband to

5    leave and they took me.  They told me:  You have to go with

6    us.  They took me and they take me upstairs and they put me

7    inside a small cage.  And where they put me, there was no

8    light, no windows, no air condition, no nothing.

9           They put me inside this cage, and I was screaming

10    and said:  Why are you just detaining me?  Because -- just

11    because of the federal lawsuit?  It's unfair.  And I was

12    screaming after I heard, like, a woman --

13    Q.   Let me stop you for a second because you're going

14    quickly, and I can see we need to be sure that the record is

15    clear.  And so for madam court reporter's sake, I'm going to

16    interrupt you occasionally so that the record is clear.

17    Okay?

18           You were taken to a small cage.  Describe for the

19    Court the cage that you were put in.

20    A.   The cage, Your Honor, it was small and -- it was very

21    small, there was no windows, there was no fresh air, there

22    was no light, and there is the hole on the floor.  You cannot

23    even use it as a bathroom.

24    Q.   Excuse me.  The hole on the floor was for purposes of

25    you using it as a bathroom?

1    A.    Yes.

2    Q.    Was there anything else inside the room?

3    A.    And -- no.  There was a small bed that you cannot even

4    sit on it and it was broke and there was a very bad smell.

5    Q.    All right.  When you were inside of that caged area, for

6    how long were you there initially?

7    A.    They keep me till, like, 12 hours.

8    Q.    And during those 12 hours, were you fed?  Were you given

9    food?

10   A.    No, they didn't bring me food.  After one day when they

11   closed the cage on me, I don't know what was the time, I

12   heard, like, some woman.  There was screaming and crying.

13   And here I was in a total panic, and I fell down on the

14   floor.

15          I was really crying, and I don't know what -- what

16   will happen with me.  Maybe they will torture me or they will

17   kill me.  I don't know.

18   Q.    Mrs. Mansour --

19   A.    I start to scream and shout and say:  Please, please,

20   I'm not feeling good.  I feel like my heart attack.  I need

21   somebody to help me.

22          And can I explain?  And after --

23          THE COURT:  Listen to me.  Just take a deep breath.

24   Okay?  And tell us.  I know this is very emotional for you.

25   Okay?  But we need to understand what you're saying.

```
 1              THE WITNESS:  Yes.
 2              THE COURT:  So you need to, number one, speak more
 3     slowly; like if you were speaking to a child maybe.  Okay?
 4              THE WITNESS:  Okay, Your Honor.
 5              THE COURT:  And just tell the story.  Even though
 6     it's hurting inside, tell the story so we can get the
 7     complete story.  Okay?
 8              THE WITNESS:  Okay.
 9              THE COURT:  Can you try that?
10              THE WITNESS:  Okay, Your Honor.
11              THE COURT:  Okay.  Go ahead.
12              THE WITNESS:  And later I was screaming.  And after
13     when I was screaming because I didn't -- I felt like I would
14     have a heart attack or stroke, I was screaming.
15     BY MR. VILLASANTE:
16     Q.   Mrs. Mansour, let me ask you something so that the Court
17     is aware.  Do you have any medical conditions?
18     A.   Yes.  I'm diabetic and I'm taking some medication.
19     Q.   And when you were in the cage, you described hearing
20     another woman screaming?
21     A.   I heard another woman that was screaming next to me, and
22     she -- I was in a total panic attack.  I was really afraid,
23     and I don't know.  Maybe -- maybe they would torture me.
24     Q.   Mrs. Mansour, what was your impression, your
25     understanding that was happening to the other woman who was
```

1    screaming?

2    A.   That they were maybe hurting her or raping her.  I don't

3    know because she was really screaming too much.  And I

4    thought they were set to torture me also, so I fell down and

5    I was screaming and I called somebody --

6              MS. MASELLA:  Objection, Your Honor.

7              THE COURT:  Yes.  I'm sorry.  Go ahead.

8              MS. MASELLA:  Is there a question pending, Your

9    Honor?

10             MR. VILLASANTE:  Yes, Your Honor.  I'm asking for

11   her to describe her detention, and at this point the

12   detention is in that caged area.

13   BY MR. VILLASANTE:

14   Q.   So my question is:  Please describe for the Court the

15   circumstances of your detention while you were in the caged

16   area after you heard the woman screaming.  Go from that time

17   period forward.

18   A.   After I heard the woman, she was screaming, Your Honor,

19   I -- I start to shout and scream and I was really afraid.

20             And after that, there was an army man.  He came and

21   he start to shout at me:  Why you are screaming?  And I told

22   him:  I'm not feeling good.  Please help me because I fell

23   down and I didn't take my medication.

24             So this man -- this army man, he was holding a

25   knife.  He start to run the blade of the knife on the steel

1    cage, and he told me:  Shut up.  I don't want to hit you.  I

2    told him:  Please, I'm not feeling good.  I have to take my

3    medication and I cannot breathe even.  There is no window.

4    And he told me:  That's your problem.  And he left.  He left

5    me on the floor.

6    Q.   Mrs. Mansour, let's move forward.  You were in this

7    caged area?

8    A.   Yes.

9    Q.   You described it as a small area --

10   A.   Yes.

11   Q.   -- with everything that just happened.

12            And you were there for 12 hours; correct?

13   A.   Yes.

14   Q.   All right.  So we can move ahead to the next day.  Was

15   there anything else that happened during those 12 hours

16   besides the woman that you thought was being tortured and the

17   knife with the military man?

18   A.   I couldn't breathe.  I was in a total panic.  Like I

19   can't -- like I'm dying.  It was a horrible night.  I don't

20   know.  I was praying, and I didn't know what to do.

21   Q.   Tell me what happened after those 12 hours.  Where were

22   you taken from there?

23   A.   And the second day, Your Honor, there is another army

24   man.  He came and open the cage on me and he took me to the

25   officer downstairs and I saw my husband.  He was inside the

1     office.  And I was asking him:  Why are you detaining me?

2     Q.   Describe for the Court where specifically did they take

3     you?  Was there another prison?

4     A.   Yes.

5     Q.   Where did they take you?  Describe it for the Court.

6     A.   They took me to the Internal Security Forces to just

7     interrogate me.  So I was in the detention center next to the

8     airport, and they want to transfer me to another, like,

9     Internal Security Forces to interrogate me about the federal

10    lawsuit.  That's what he explained for me, the general.

11    Q.   Were you taken to an interrogation room at the Internal

12    Security Forces, the ISF?

13    A.   Yes.

14    Q.   Describe for the Court --

15         First of all, what is your understanding of the

16    ISF?  Who are they?

17    A.   The ISF, Your Honor, is where they put all the

18    terrorists of all the world inside this center.  All the

19    people who are terrorists, they put them there.  They are

20    really very dangerous people.  They put them in this center

21    where they transferred me already.

22         And I couldn't breathe.  I was really -- and they

23    want to put a whole bag on my head to take me with them to

24    the Internal Security Force.

25    Q.   Let me interrupt.  I'm sorry.  I just want to go by

1    timeline.

2           So now when you arrived at the interrogation

3    center, are you placed in another cell?  Or where are you

4    placed?

5    A.   They took me to the Internal Security Force also with

6    the army, and there was also, maybe, four soldiers also.  All

7    of them that were holding -- like I was something, a criminal

8    -- they were holding AK-47s.  And they took me to the

9    Internal Security Forces, and they took me upstairs directly.

10   Q.   Did they take you to a room?

11   A.   No.  They took me first to a bathroom, and they forced

12   me to remove all my clothes.  And I was asking:  Why do you

13   want me to remove my clothes?  And they told me:  If you will

14   not remove, we will remove your clothes by force.

15          And I was crying and screaming:  I don't want to

16   remove my clothes.  Just to break me down, they ordered me to

17   remove my clothes for a few minutes.  After they told me:

18   Put your clothes on you.  And I was really crying.

19          I couldn't -- I fell down.  I couldn't sit.  I was

20   in a total panic after they told me:  Put your clothes on and

21   go to the interrogation room.  I put --

22   Q.   And once you were strip searched or you were stripped,

23   then they had you go to the interrogation room after?

24   A.   Yes.

25   Q.   Describe for the Court your experience in the

```
 1    interrogation room.
 2    A.   They took me, Your Honor, to interrogation room.  There
 3    was two guys; one, his name that he told me, his name is
 4    Captain Cezane.
 5    Q.   Cezane?
 6    A.   Cezane.
 7    Q.   Cezane is French.
 8    A.   Cezane and the other man who was writing was going to
 9    interrogate me, and they start to interrogate me just about
10    the federal lawsuit.
11    Q.   When you talk about the federal lawsuit, you're talking
12    about this lawsuit that we're here today for?
13    A.   Yes.
14    Q.   So you were taken to an interrogation room.  Two
15    soldiers are interrogating you at that point?
16    A.   Yes.
17    Q.   And the only subject matter of questioning was the
18    federal lawsuit?
19    A.   The federal lawsuit.
20    Q.   For how long were you kept in the interrogation room?
21    A.   Six, seven hours, Your Honor, they interrogate me:  Why
22    you filed a federal lawsuit?  I said:  What's the problem if
23    I filed?  It was a civil lawsuit.  What was the crime?
24    What's the problem if I filed a civil lawsuit?  This is my
25    right.
```

1           So they start to interrogate me about:  Who is your

2    lawyer?  What's the name of the lawyer?  Who is the judge?

3    If you know the judge.  It's not civil, it's criminal.  I

4    tell them:  It's not a criminal.  Only the government in the

5    United States can sue you as a criminal lawsuit.

6    Q.   Mrs. Mansour, let me stop you there.  If I understand

7    your testimony, what you were telling your captors --

8    A.   Yes.

9    Q.   -- is that you had filed a civil lawsuit; that in the

10   United States you can't file a criminal lawsuit?

11   A.   Yes.

12   Q.   Is that what you were saying?

13   A.   Yes.

14   Q.   So for seven hours they interrogated you about your

15   federal lawsuit?

16   A.   Yes.

17   Q.   During that time, other than the two individuals that

18   were interrogating you, did there come a point where you saw

19   anybody else?

20   A.   Yes.  When they were interrogating me, Your Honor, I saw

21   -- they opened the door and they bring me water.  I didn't

22   eat anything from before, 24 hours.  Till the morning they

23   bring me water because I need to bring and take my

24   medication.  I told them:  I have my medication.  They bring

25   me my medication because I told them:  Please, I have

```
 1    diabetes.  After, they told me:  Wait a little bit.  I need
 2    to go open --
 3    Q.   Mrs. Mansour, I need for you to slow down just a little
 4    bit.
 5    A.   I'm sorry for that.
 6    Q.   So once the door is opened, they --
 7    A.   Yes, they --
 8    Q.   Mrs. Mansour, one at a time.  Okay?
 9    A.   Yes.
10    Q.   I know this is very difficult.
11    A.   Okay.
12    Q.   We all know this is very difficult.  So I just want you
13    to, please, let's go slowly --
14    A.   Yes.
15    Q.   -- so that the record is clear.  Okay?
16    A.   Okay.
17    Q.   You testified that at some point the door is opened?
18    A.   Yes.
19    Q.   And then you saw other individuals that were not the two
20    soldiers?
21    A.   Yes.
22    Q.   Describe for the Court what you saw.
23    A.   They opened the door because they told me, give me five
24    minutes.  Then going outside, I saw Dany Macaron, one of the
25    defendants, was with my brother outside and talking and
```

1    laughing and repeating everything:  I was just to dismiss the

2    federal lawsuit again.  They, like, come back and they

3    interrogate me.

4    Q.   Who came in to interrogate you?

5    A.   Captain Cezane.

6    Q.   All right.  You saw one of the other defendants, Dany

7    Macaron?

8    A.   Yes.

9    Q.   But he did not come in with them?

10   A.   No.  They stayed outside.

11   Q.   He was outside and you overheard him while he was

12   outside speaking with one of your brothers?

13   A.   Yes.

14   Q.   Who was also a defendant?

15   A.   Yes.

16   Q.   Once they come back inside and they continue the

17   interrogation, what did they request from you?

18   A.   They told me -- you know, after six, seven hours, I was

19   really tired.  And they told me:  You will not leave this

20   place if you will not dismiss the federal lawsuit.

21        I said:  I will not dismiss the federal lawsuit.

22   Whatever you want to do, even you want to kill me, I don't

23   want to dismiss the federal lawsuit.  You cannot -- it's my

24   right, and you cannot force somebody to dismiss the federal

25   lawsuit.

```
 1              And he told me:  So you will stay here.  You cannot
 2    leave.  I tell him:  Okay.  You want to keep me here, keep
 3    me.  I will not dismiss.  Even you want to kill me, I will
 4    not dismiss the federal lawsuit.
 5    Q.   And what happened?
 6    A.   I was crying.
 7    Q.   What happened after you denied them dismissing the
 8    lawsuit?
 9              Where did you go from there?  Explain to the Court
10    what happened after that.
11    A.   They took me again.  They took me underground where it
12    was all the terrorists for the ISIS, Al Qaeda, and there was
13    the son of Gaddafi downstairs.
14    Q.   Let me just stop you because, again, just to help with
15    the transcript.
16              After this, they take you downstairs in an area
17    where they're holding ISIS and Al Qaeda prisoners and the son
18    of Gaddafi?
19    A.   Yes.
20    Q.   And describe for the Court that general prison area
21    where they took you to that was underground.
22    A.   Your Honor, this is underground like a mine; seven
23    floors underground.  If you go inside, it's darkness.  You
24    cannot see even your hands.  You cannot see even your hands,
25    and there is a small light.  You can go inside, there was a
```

 1   small, small light, and you go and there was cages.  All the
 2   cages of these terrorists, that was full.  They put all the
 3   terrorists inside.

 4        So they didn't put me inside the cage.  They put me
 5   with them.  There was five army men, and they were wearing
 6   black masks, and they put me next with them.  And I was
 7   shaking and crying and I was real afraid.  I thought this
 8   night they will kill me for sure; I will not survive anymore.

 9        I was thinking about my kids and my husband, I
10   would never see anymore my family, it was my last night.  And
11   I was crying and I didn't know what to do.  I didn't know
12   what to do.

13   Q.   Mrs. Mansour, how long --

14        MR. VILLASANTE:  Your Honor, may I help her with
15   some water?

16        THE COURT:  Yes, of course.

17        MR. VILLASANTE:  Thank you.

18        THE COURT:  Yes.  That's why we have it there.  And
19   if we need a break, we can take it.  If she needs a break at
20   anytime, we can do that too.

21        MR. VILLASANTE:  Thank you.

22        THE WITNESS:  Sorry.

23   BY MR. VILLASANTE:

24   Q.   There is no need to be sorry.  I'm just trying to make
25   the testimony as clear as possible.

After they take you to that segregated area for Al Qaeda and ISIS, for how long did you remain in that dark cell?

A. They keep me till the morning before -- they keep me down till the morning.

Q. To the next morning?

A. To the next morning. And before they took me upstairs for the next morning, they bring one of these terrorists they put in front of me, and they start to --

Q. Let me just, so we're clear --

A. Sorry I'm going so fast.

Q. So the next morning --

A. Yes, the next morning.

Q. The next morning they take you out of that isolated area, the segregated area, and they bring you where?

A. Before they took me upstairs --

Q. Okay.

A. -- to interrogate me again, they bring one of these terrorists, they put him in front of me, and they start to torture him. And there was, like, ten army. They put all black masks on. They start to torture.

After, I fell down. I couldn't look at them. And they bring me, like, water and sugar and they took my blood pressure and they took my blood sugar. I wasn't feeling good. I -- I -- I didn't feel well at all. After they told

1   me:  Let's take you upstairs.  They took me again upstairs,

2   and they put me inside a waiting office.

3   Q.  Mrs. Mansour, your understanding of the circumstances,

4   what was your understanding of the purpose of them bringing

5   another prisoner and torturing him in front of you?

6   A.  Just to show me, Your Honor, that:  If you will not

7   dismiss the federal lawsuit, that will happen for you.  We

8   will treat you the same like we are treating this terrorist.

9   We will torture you.  Maybe they will kill me for sure if you

10  will not dismiss.  Again, they took me upstairs.

11  Q.  All right.  Now describe for the Court what happened

12  when they took you upstairs.  And, again, let's try to go

13  slow paced, as slowly as possible.

14  A.  They took me upstairs and they put me inside the waiting

15  office.  Again Captain Cezane came and he told me:  You want

16  to dismiss the federal lawsuit.  Again he asked me for the

17  second day.

18          I told him:  I don't want to dismiss the federal

19  lawsuit.  Even I told you yesterday.  You want to hurt me,

20  you want to kill me, whatever you want to do, I will not

21  dismiss the federal lawsuit.  He said:  Fine.  And he leave.

22          And maybe one hour, I don't know exactly, I saw my

23  husband.  They bring my husband and I saw my husband.  I was

24  crying and he was crying and I hold him.  After he told me:

25  We have to dismiss the federal lawsuit or they will sentence

1    us here for jail and they will not let you to leave this

2    area.  We have to dismiss.  I said:  No, I don't want to

3    dismiss.  If you want to do --

4    Q.   Mrs. Mansour --

5    A.   -- I don't want you to dismiss.

6    Q.   -- did there come a point when your husband was with you

7    that you called your American attorney?

8    A.   They bring my husband inside, Your Honor, and they put

9    us inside an office and I don't recall.  Only was Captain

10   Cezane there.

11          And later on maybe there was one also he came and

12   he sit next to me.  And they bring the phone for my husband

13   and tell him:  Call your attorney in the States.

14          He called Mr. Berkeley, and he told him:  Tell him

15   to dismiss.  My husband was calling Lorne Berkely.  I quickly

16   took the phone from him and I return around the corner.  I

17   said:  Please don't dismiss the federal lawsuit.  And call

18   the FBI.  They will kill us.  And they took us as hostage.

19   Please call the FBI to help us.  Please.

20   Q.   Mrs. Mansour, just so the record is clear, they used

21   your husband's cell phone --

22   A.   Yes.

23   Q.   -- to call Mr. Berkeley?

24   A.   Yes.

25   Q.   And when they instructed him to tell Mr. Berkeley to

1    dismiss the lawsuit --

2    A.   Yes.

3    Q.   -- you grabbed the phone from your husband's hand?

4    A.   Yes.

5    Q.   And you told Mr. Berkeley:  Don't dismiss.  Call the

6    FBI.  Am I understanding your testimony?

7    A.   They will kill us.  Please.  It's very dangerous, our

8    situation is, very.  Call to the FBI and tell them they have

9    -- we have been taken hostage.  Please, Lorne.

10         The captain took the phone from me by force and he

11   give it back to my husband and he told him:  Dismiss already

12   the federal lawsuit.  He ordered him.  After my husband said

13   to Mr. Berkeley:  Dismiss the judge.

14         First thing he demands to ask, dismiss the judge.

15   Q.   Stop for one second there.  Is one of the defendants in

16   this case that is a judge in Lebanon; correct?

17   A.   Yes.

18   Q.   All right.  And what was being asked of your husband is

19   to dismiss first --

20   A.   The judge.

21   Q.   -- that judge?

22   A.   Yes.

23   Q.   All right.  And this was immediately after what you just

24   described to us where he yanked the phone?

25   A.   Yes.  He took it by force from me.

1    Q.   So please continue to describe what happened in that

2    phone conversation with your husband, Mr. Berkeley, and

3    Captain Cezane?

4    A.   My husband, he told already for my lawyer, Lorne

5    Berkeley, to dismiss the case from the judge.  And I was

6    screaming:  Don't listen.  Lorne, don't listen to my husband,

7    please.  Please.  Like I told you, go call the FBI.

8         And the guy, he told me -- next they bring -- he

9    said:  If we scream, we will take you again now underground

10   and you will be tortured.  I don't want to hear your voice.

11        After my husband tell him:  Okay.  I will dismiss

12   it.  Because he was afraid maybe they will kill us.  He told

13   Mr. Berkeley to dismiss the charge.

14   Q.   Let me stop you there.

15   A.   And he told him:  Send an e-mail.  And they sent an

16   e-mail from my husband.  It's not from me, Your Honor.  I

17   didn't dismiss the federal lawsuit.  Even they forced me to

18   dismiss it, I didn't accept.

19   Q.   Let me ask you this:  At that point were you aware of

20   any threats that had been made directly to your husband at

21   that point?

22        Not later on, but at that point were you aware of

23   the threats that they had made to your husband when he was

24   walking in?

25   A.   I didn't understand.  I'm sorry.

```
 1    Q.   Did there come a point where you learned that your
 2    husband had been given specific threats different from what
 3    you were threatened?
 4    A.   Yes.  Yes.
 5    Q.   All right.
 6    A.   After, later on I knew.
 7    Q.   You learned it later on?
 8    A.   Yes.
 9    Q.   So at the time that your husband spoke to Mr. Berkeley
10    to dismiss, what were the additional threats that they had
11    made to him?
12    A.   They want to bring my daughter --
13              MS. MASELLA:  Objection, Your Honor.  Hearsay.
14              THE COURT:  One moment.  Yes, ma'am.
15              MS. MASELLA:  Hearsay, Your Honor.
16              THE COURT:  Hearsay.
17              MS. MASELLA:  Statements made to the husband at
18    some point outside of her presence.
19              MR. VILLASANTE:  No.  My question is to her:  What
20    knowledge did she come to have of the threats that her
21    husband was under at the time of the phone call.
22              THE COURT:  Yes.
23              MR. VILLASANTE:  What's her understanding.
24              THE WITNESS:  Threats.
25              THE COURT:  Right.  She's testifying about actions
```

1   that were taken.  Do not repeat anything that you heard
2   directly from your husband; just say what you understood was
3   happening.
4          THE WITNESS:  My -- I understood first that they
5   want to kill us and they will not let us out of this
6   detention before they kill us.  I didn't even think what
7   after.  I knew that they want to bring my daughter because
8   she came -- she come back with us from the USA to Beirut.
9   They want to take my daughter and bring her and torture her,
10  and maybe they will hurt her and kidnap her and they will
11  torture her.
12         My husband knew that they want to bring my
13  daughter, Yasmina, which is in med school here.  She's in med
14  school in the United States.  They want to bring my daughter
15  and torture her to force me to dismiss or force my husband.
16  They threatened to bring my daughter, to hurt her.
17  BY MR. VILLASANTE:
18  Q.   And was your daughter in Lebanon at that time when you
19  were --
20  A.   Yes.  She was at my brother-in-law.  We hide her inside
21  the house of my brother-in-law.  Take my daughter and hide
22  her because she was afraid if they will bring my daughter and
23  they will torture her also to force me to dismiss.
24  Q.   Let me go back to where we are in terms of the timeline.
25  Okay?

1            At this point your husband is on the phone with Mr.

2     Berkeley; correct?

3     A.   Yes.

4     Q.   All right.  And he instructs Mr. Berkeley to dismiss the

5     case?

6     A.   Yes.

7     Q.   And then you spoke about an e-mail that was sent?

8     A.   From my husband.

9     Q.   All right.  And what was that e-mail and to whom?

10    A.   My husband sent an e-mail for Mr. Berkeley to dismiss,

11    just first the judge because they want to dismiss only the

12    judge.  They asked for dismiss of the name.

13    Q.   And then what happened after that, or was that it?  Did

14    that become enough for you to be released?

15    A.   No.

16    Q.   What happened then?

17    A.   They didn't even -- they want more.  After three hours,

18    they bring again the phone.  They keep us in this room, and

19    they came and they told us:  Now you have to dismiss the

20    default judgment with the family members.  And my husband

21    told them:  I cannot.  This is for the court.  I cannot

22    dismiss a default judgment.  The judge can dismiss it.  No,

23    you can.  Now, call your lawyer again and dismiss all the

24    family members and the default judgment and with prejudice.

25            And I was screaming and tell him:  It's unfair.

1   It's unfair.  You took everything.  I don't want to dismiss

2   my case.  And I was screaming, Your Honor, in this room, and

3   there was a camera and everything.  You can see it.

4   Q.   Now, did there come a point where a dismissal -- as you

5   understand it, a dismissal was entered by your lawyer in the

6   United States in this case?

7   A.   Excuse me?

8   Q.   When you were there and the e-mail was sent, did there

9   come a point where a dismissal was, in fact, filed?

10  A.   Yes.

11  Q.   Was that enough for you to obtain your release?

12  A.   No.

13  Q.   What happened then?

14  A.   They didn't accept only to dismiss the federal lawsuit

15  and all the default judgment and all the family members.

16  Also they -- they took us again to torture me and my husband.

17  They put us down underground, and they didn't let us go

18  before I have given ransom for my inheritance in Lebanese.

19  They took my inheritance.  Also they asked for my inheritance

20  that I -- it's my right.  They want also to take my

21  inheritance.  This was for me, to take my freedom from me and

22  my husband.

23  Q.   All right.  So you were detained on April 2nd?

24  A.   Yes.

25  Q.   On what day were you finally released?

```
 1    A.    On April 11th.
 2    Q.    All right.  And during that entire period of time, you
 3    were in the type of conditions and circumstances that you
 4    described here?
 5    A.    Yes.
 6    Q.    Why is it that the dismissal -- I believe the docket
 7    entry will show it took place and an order was entered on the
 8    5th.
 9    A.    Yes.
10    Q.    Why were you not released on the 5th as you understand
11    it?
12    A.    They didn't let us, Your Honor, before they saw the
13    Honorable Jose Martinez signed, all right, the federal
14    lawsuit, and they put it on the screen.
15    Q.    Let me stop you there for a second.  When you refer to
16    the screen --
17    A.    Yes.
18    Q.    -- you're saying that they wouldn't let you go until the
19    judge's order was actually entered on the docket and they
20    could see it on the computer?
21    A.    Yes.
22    Q.    So how many days, more or less, were you held during
23    that process?
24    A.    They wait till they saw the signature of the Honorable
25    Jose Martinez's signature on the screen and with prejudice
```

1    and with all the defendants.  And when they saw everything is

2    done already, they took us again for a hearing.  They took me

3    and my husband for a hearing, and here they want to take us

4    to just maybe kill us because they finished already from the

5    federal lawsuit.

6    Q.   Describe for the Court the transportation.

7    A.   They took us inside a black car where it was like -- and

8    there was two black cars follow us.  There was maybe, like,

9    20 or 30 army men.  It was like a war.

10          And they took us before Ziad Abo Haidar, one of the

11   defendants.

12   Q.   Stop for one second because I know we're not going to

13   get that.  Ziad Abo Haidar?

14   A.   Yes.

15   Q.   Z-i-a-d, A-b-o, H-a-i-d-a-r?

16   A.   Yes.

17   Q.   And tell me what happened with Mr. Abo Haidar?

18   A.   Majed Bouez, he was outside.

19   Q.   You saw Majed Bouez, being the attorney in Lebanon?

20   A.   He was supposed to be our attorney, but he is working

21   more for the defendant.  He worked more for the government

22   and the other one you referred to me.

23   Q.   Let me stop you for a second.  So continue by going

24   forward on a timeline.  Okay?

25          At this point you had already or your husband had

1    requested that the case be dismissed, but they were waiting

2    for the docket entry and they transport you to a hearing; is

3    that correct?

4    A.    Yes.

5    Q.    All right.  And during the course of that

6    transportation, explain to the Court the circumstances that

7    you were describing; many cars, many soldiers, et cetera.

8    A.    They put us inside the car and there was waiting for the

9    attorney, whose name is Majed Bouez, and we saw him outside.

10   We called him.  He didn't even look at us or answer us.  He

11   was not, like, our lawyer and went to Ziad Abo Haidar.

12   Q.    Okay.  He went to speak to Ziad?

13   A.    Ziad Abo Haidar.  One of the army men also, he went with

14   Majed Bouez.  And he heard him.  He heard that there was

15   negotiation, how they would separate me from my husband, and

16   they want to sentence us for three years jail and they want

17   to kill us for sure.  For sure, Your Honorable Judge.

18          He said they don't want us to come back and tell

19   you what happened.  That's everything that they want.  They

20   don't want me to come back to the States, and they were

21   negotiating how they would sentence us.

22          And he come back, one of the army men, and he told

23   us:  Are you sure this is your lawyer?  We say:  Why?

24   Because he is discussing how they want to sentence you for

25   three years jail and they will not let you come back to the

1    U.S. from here.

2    Q.   Let me stop you there for one second.

3    A.   Me and my husband, we were crying.  We were crying and

4    inside the car saying:  Please don't let them take us and

5    kill us.  Please.  We were begging them.

6    Q.   Where did you understand you were being taken to?  Was

7    it a military facility?

8    A.   Yes.  They want to take us to a military facility where

9    they put more than the one they put me, more and more all the

10   terrorists for all the people that they kill.  And, I don't

11   know, maybe they want to kill us.

12   Q.   And did they, in fact, take you to that military

13   facility?

14   A.   No.  They called the General Hamoud, one of the Internal

15   Security Forces.  They called him and they told him there is

16   the situation and he said:  No, we don't want to be involved

17   with the American citizen residents.  Bring them here.  Bring

18   them back to the Internal Security Forces.

19           So they bring us fast directly to the Internal

20   Security Forces.

21   Q.   And what happened there?

22   A.   And there they took us upstairs and they told us that

23   the embassy will come and talk to us, and we feel better.

24   And we wait for the U.S. embassy from consul or from the

25   official, the ambassador, and they don't show.  But we

1    thought that they came and they looked at us because they put

2    us inside a room where it was all glass so they can see us,

3    that we're still alive.

4    Q.   Just so that I understand, they placed you inside an

5    interrogation room with mirrored walls?

6    A.   Mirrored.  All room, it was all mirrored, like glass.

7    Q.   And it is your understanding that people from the

8    embassy --

9    A.   Yes.

10   Q.   -- came to see you?

11   A.   If we were still alive.  If we're still alive.

12   Q.   After you were there, where were you taken next and what

13   happened?

14   A.   After they didn't come, we didn't talk to anybody, they

15   told us:  Now, let's take us to General Hamoud's office.  It

16   was the first time we met with the general of all the

17   Internal Security.

18   Q.   General Hamoud?

19   A.   Yes.

20        COURT REPORTER:  Judge, I don't have the spellings

21   of any of these names.

22        THE COURT:  I'm sure counsel will help you

23   afterwards.

24        MR. VILLASANTE:  I will be happy to go over the

25   names.

```
 1    BY MR. VILLASANTE:
 2    Q.   So the general of the ISF then comes to see you in the
 3    interrogation room?
 4    A.   Yes.
 5    Q.   What happened then?  And, again, I know it's difficult,
 6    but we have to go as slowly as possible for the court
 7    reporter.
 8    A.   Yes.  I'm sorry.
 9    Q.   What happened after the general returns to the
10    interrogation room?
11    A.   No.  They took us to the General Hamoud, to his office.
12    Q.   Yes.
13    A.   And here he told us:  I cannot anymore.  You have to
14    call the U.S. embassy and tell them that all these
15    defendants, this Judge Ziad Haidar -- Ziad Abo Haidar, they
16    force him -- they forced General Hamoud to take us from the
17    Internal Security Force office.  They want to hurt us.
18    Q.   I'm not understanding you there.  The general is telling
19    you what?
20    A.   He told me:  I'm detaining you here.  It's by the
21    judges, they order me to detain you.  But I'm not involved
22    with this detain.  I want to tell you that, call the U.S.
23    embassy and explain the situation; that they want to take you
24    from here, and for sure they want to kill you.  I cannot
25    anymore.  They were calling and calling and calling.
```

```
 1   Q.   Mrs. Mansour, did there come a point where you got to
 2   speak with someone at the embassy?
 3   A.   Yes.
 4   Q.   And were you able to explain what the general had told
 5   you; that your life was in danger?
 6   A.   Yes.
 7   Q.   Did there come a point where you in fact were released?
 8   Correct?
 9   A.   Yes.
10   Q.   All right.  And what led to your release?  What finally
11   happened that led to your release from these circumstances?
12   A.   I'm sure from the U.S. embassy and my lawyer, he -- I
13   think he called the minister of justice because I told them
14   to call the FBI.
15        I don't know, but there was a lot of pressure, Your
16   Honor, on this defendant and one of the consuls.  Her name is
17   Cindy.
18   Q.   One of the consuls?  One of the officers?
19   A.   Yes.  She visited us in the detention center on Monday,
20   and we explained for her the situation.  She told me:  I know
21   everything.  Don't worry.  I went to Ziad Haidar's office and
22   we forced him to not take you from here.  You will leave
23   after a few days.  Don't be afraid.  We will help you.  We
24   will not keep you here.
25   Q.   All right.  So at that point --
```

```
 1    A.   We were crying, me and my husband.  I was begging her:
 2    Please, they want to kill us for sure.  Please, consul.
 3    Please do your best and take us from here.  And bring my
 4    daughter also with me on the airplane to come back home, to
 5    come back to the States.
 6    Q.   At the time that this lawsuit was dismissed --
 7    A.   Yes.
 8    Q.   -- were you in the state of anxiety and duress that we
 9    even see here today?
10    A.   More.  More.  I was really crying and I thought I will
11    never survive anymore.  I will never see my kids anymore.
12              That's what they want to do.  That's what they want
13    to do.  They don't want me to come back home anymore, for
14    sure.
15    Q.   Thank you, Mrs. Mansour.  I don't have anything further
16    to ask you.
17              MR. VILLASANTE:  Thank you, Your Honor.
18              THE COURT:  Defense.
19              MS. MASELLA:  Thank you, Your Honor.
20              THE COURT:  Yes.
21                        CROSS-EXAMINATION
22    BY MS. MASELLA:
23    Q.   Good morning, Mrs. Mansour.
24    A.   Good morning.
25    Q.   Do you need a moment, or are you all right?
```

```
 1    A.   I'm fine.  Thank you.

 2    Q.   Mrs. Mansour, can you tell us what country you are a

 3    citizen of?

 4    A.   I am a citizen of -- I am a citizen of Lebanon and I am

 5    a resident of U.S.

 6    Q.   Thank you.  You're not a citizen of the United States;

 7    correct?

 8    A.   I am a resident.

 9    Q.   But not a citizen?

10    A.   And I am a resident of Florida.

11    Q.   Just to make sure the record is clear:

12         You're not a citizen of the United States, correct?

13    A.   Excuse me?

14    Q.   You are not a citizen of the United States?

15    A.   I am a resident of the United States.  I am a resident

16    of Miami.

17    Q.   Okay.

18         THE COURT:  Ma'am, I'm sorry.  Try to answer the

19    question.  It's either yes or no.

20         You're either a U.S. citizen or you're not.  Which

21    is it?

22         THE WITNESS:  I am a resident.

23         THE COURT:  Ma'am, listen to me.  Are you a United

24    States citizen?

25         THE WITNESS:  No.
```

```
 1                    THE COURT:  No, not a United States citizen; is
 2      that correct?
 3                    THE WITNESS:  Yes.
 4                    THE COURT:  So when you're asked questions, you
 5      need to answer them.
 6                    THE WITNESS:  Okay, Your Honor.
 7                    THE COURT:  Do you understand?
 8                    THE WITNESS:  Thank you.
 9                    THE COURT:  Go ahead, ma'am.
10                    MS. MASELLA:  Thank you, Your Honor.
11      BY MS. MASELLA:
12      Q.   Now, in connection with what we are referring to as the
13      federal lawsuit -- which is the lawsuit here in this
14      courthouse -- you had retained United States counsel in
15      connection with that lawsuit; correct?
16      A.   I'm sorry, I didn't understand.
17      Q.   You had an attorney in connection with that lawsuit;
18      correct?
19      A.   Yes.
20      Q.   And that's Mr. Lorne Berkeley --
21      A.   Correct.
22      Q.   -- at the time of these events?
23      A.   Yes.
24      Q.   And you and your husband were in communication with him
25      during the time that you were in Lebanon?
```

1    A.    Yes.

2    Q.    And you also had Lebanese counsel; correct?

3    A.    Yes.

4    Q.    And that's the individual that you referred to as Majed

5    Bouez?

6    A.    Yes, Majed Bouez.

7              MS. MASELLA:   Thank you, Your Honor.   I have no

8    additional questions at this time.

9              THE COURT:   All right.   Redirect.

10             MR. VILLASANTE:   Just brief redirect, Your Honor.

11                        REDIRECT EXAMINATION

12   BY MR. VILLASANTE:

13   Q.    When you say you're a resident of the United States,

14   you're a permanent resident with a green card?

15   A.    Yes.

16             MR. VILLASANTE:   Thank you.

17             THE COURT:   All right.   Thank you, ma'am.   You may

18   step down.

19             THE WITNESS:   Thank you.

20             (Witness excused)

21             MR. VILLASANTE:   Your Honor, if we may have just a

22   five-minute comfort break before Mr. Elie Samaha?

23             THE COURT:   Yes.   Let's take ten minutes.

24             (Recess)

25             THE COURT:   Mr. Villasante.

1           MR. VILLASANTE:  Thank you, Your Honor.  We call

2     Mr. Samaha.

3           THE COURT:  All right.

4           THE COURTROOM DEPUTY:  Please raise your right

5     hand.

6           (Witness duly sworn)

7           THE WITNESS:  I do.

8           THE COURTROOM DEPUTY:  You may be seated.  Please

9     state your full name for the record, and spell your last

10    name.

11          THE WITNESS:  Elie Samaha, S-a-m-a-h-a.

12          THE COURT:  Okay.  Go ahead, Mr. Villasante.

13          MR. VILLASANTE:  Thank you, Your Honor.

14            ELIE SAMAHA, PLAINTIFF WITNESS, SWORN

15                     DIRECT EXAMINATION

16    BY MR. VILLASANTE:

17    Q.   Mr. Samaha, what is your relationship to Lara George

18    Mansour?

19    A.   I'm her husband.

20    Q.   And with respect to the lawsuit that we're here today

21    for, did you communicate with your wife's attorneys related

22    to this lawsuit during the course of the pendency of the

23    litigation?

24    A.   You mean Mr. Berkeley?

25    Q.   Mr. Berkeley or other lawyers on her behalf.

```
 1   A.   When we were detained at the ISF, I spoke to Mr.
 2   Berkeley, yes.
 3   Q.   Tell me -- let's go back in terms of dates.  Beginning
 4   on April 1st or April 2nd, you and your wife decide to return
 5   to Lebanon; is that correct?
 6   A.   Correct.
 7   Q.   And what were the circumstances that led to your
 8   decision to return to Lebanon?
 9   A.   My wife's attorney, Mr. Berkeley, told my wife and told
10   me that they reached a settlement and to return back and they
11   would give her her money.
12   Q.   You went to Lebanon under the impression that the matter
13   was being settled?
14   A.   Yes.
15   Q.   All right.  What happened when you returned in Lebanon,
16   to you?
17   A.   Well, on April 2nd they took my wife; and then on
18   April 4th they told me to come in to the ISF, and they
19   detained me.  And they said:  You have to dismiss the
20   lawsuit.  Your wife is not dismissing the lawsuit.
21   Q.   Did they ever file any formal criminal charges against
22   you?
23   A.   Nothing.
24   Q.   Are you a plaintiff in this lawsuit?
25   A.   No.
```

```
 1    Q.   When they detained you, did there come a point where
 2    they brought you to the same room as your wife?
 3    A.   Yes.  They put me underground with Al Qaeda and ISIS and
 4    the son of Gaddafi.
 5    Q.   All right.  For how long were you kept in that area of
 6    the jail?
 7    A.   One night.  Thursday night.
 8    Q.   And describe from your perspective what was that area
 9    like?  Describe the jail cell, the setting.
10    A.   It's like Guantanamo for Lebanon, Your Honor.  It's
11    extremely dangerous.  Terrorists, that's where they keep
12    them; suicide bomber, people like that.
13              And they put us downstairs Thursday night till
14    Friday morning, when they took us to the hearing to see one
15    of the defendants, Ziad Abo Haidar.
16    Q.   For the court reporter, who are we speaking about there?
17    A.   Ziad Haidar, Z-i-a-d, H-a-i-d-a-r.
18    Q.   And once you were in this facility, tell the Court what
19    it is that happened to you.
20    A.   Well, they told me on Thursday -- you mean on Thursday?
21    Which?
22    Q.   Let's go to Thursday because we've already heard a great
23    deal of testimony about the timeline.  I don't want to repeat
24    that.
25    A.   Thursday morning?
```

```
1    Q.   Thursday morning, please explain to the Court what
2    happened.
3    A.   They took me inside the room, Your Honor, where my wife
4    was being -- was waiting, and they told me:  You have to
5    dismiss the lawsuit.  And I told them:  I'm not the
6    plaintiff.  I cannot dismiss the lawsuit.  They said:  No,
7    you have to dismiss it.
8              And they bring the phone and my wife starts
9    screaming and crying.  Then I picked up the phone and I
10   called.  They told me:  Call Mr. Berkeley.  And I called him
11   and I told him:  Dismiss the judges only, the defendants in
12   this case right now.
13             And my wife held the phone.  She grabbed the phone
14   from me and went to the other corner of the room and started
15   screaming:  Lorne, Lorne, don't dismiss.  Don't dismiss.
16   Call the FBI.  Call the FBI.  Captain Cezane grabbed the
17   phone back from her and he gave it back to me and he said:
18   Do it.
19             And at that time they told me, Your Honor, that my
20   daughter is going to be taken hostage too and she's going to
21   be tortured.
22   Q.   Mr. Samaha, when you were threatened with physical harm
23   to your daughter, was your wife present; or was that before
24   you entered the room?
25   A.   No.  They interrogated me in the room before I went to
```

1   see -- before they put me with my wife in the same room, they
2   asked me about the federal court, about the federal judge, if
3   I know the judge, why did my wife file, and that:  You need
4   to dismiss the case.  Your wife is not dismissing the case.
5   For your safety.
6   Q.   For how long were you detained overall in Lebanon as a
7   result?
8   A.   Eight days.
9   Q.   From?
10  A.   From April 4th to April 11th.  April 4th to April 11th.
11  Q.   What was it that finally prompted your release?  What
12  happened that resulted in you finally being able to leave?
13  A.   After they saw that Honorable Judge Jose Martinez filed
14  the default of the lawsuit, they still were nervous that he
15  might change his mind or something.  They asked Mr. Berkeley
16  for a letter saying that he -- that Lara would never or me
17  would never open the lawsuit again.
18          And Mr. Berkeley wrote that letter under the
19  condition that my daughter Yasmina, my wife, and me will be
20  released and will be out of the country.  And after he gave
21  them the paper, the letter -- the signed letter, they came
22  next day and told Lara:  You have to pay ransom.  You have to
23  give us your inheritance.  And my wife start screaming more:
24  Why?  Why are you doing this?  Are you a government?  Or are
25  you a drug cartel?  What is this?

```
 1              He says:  You have to give your money, or you will
 2    not get out.
 3    Q.   Now, the inheritance that you're referring to is part of
 4    a lawsuit in Lebanon that commenced there; correct?
 5    A.   Yes, $15 million.
 6    Q.   And that lawsuit is somewhat related to the federal
 7    lawsuit, but it's an independent lawsuit; correct?
 8    A.   Yes.
 9    Q.   So when you were detained, they were asking you to
10    obtain a dismissal of the federal lawsuit and to have your
11    wife --
12    A.   Yeah, but that happened, you know.  They didn't ask for
13    everything right away.  They asked on Thursday the judges.
14    On Thursday -- Thursday afternoon they asked for the
15    default -- default judgment and the family defendants, Friday
16    the identity.  They didn't see it on the screen.  They got
17    nervous.  They waited until Monday.
18              Monday they saw that Honorable Judge Martinez
19    signed.  They were relieved.  Then they still got nervous
20    also again.  Then they asked for Mr. Berkeley to dismiss --
21    to write the letter.  It was probably on Monday.  And then on
22    Tuesday or on Wednesday, supposed to be her lawyer, he never
23    was her lawyer, he went to the part of -- he went to a power
24    of attorney person and he signed off on her will, on her
25    inheritance money against my wife's will.
```

1    Q.   So in fact this detention resulted in a dismissal of the

2    federal lawsuit and also the inheritance in Lebanon?

3    A.   Yes, and the default judgments.

4    Q.   And how were you treated during the period of time that

5    you were there?  And I'm not going to go day by day.

6         So please describe for the Court the conditions,

7    the demeanor, the threats, everything that happened, to the

8    best of your ability.

9    A.   We were tortured morally beyond words.  We were scared

10   extremely on a daily basis.  There was attempts -- multiple

11   attempts to take us and kill us because now they obtained the

12   federal lawsuit; they didn't want us to come back to this

13   court and tell you what happened.  Whatever it takes for

14   Lara, for me, not to come back to the U.S. and tell the court

15   what happened, they will do it.

16        The ISF got very upset with the defendants, what

17   they are trying to do, and he didn't want to get involved.

18   And he told me:  Call the U.S. embassy.  Let them help you.

19   And Ambassador Elizabeth Richard and Cindy Wade and another

20   consul, general consul, they helped us.  And they went to

21   Ziad Haidar's office on Monday.

22   Q.   Ziad Haidar?

23   A.   One of the defendants.  And they told him:  You do not

24   remove Elie and Lara.  Because they knew we were going to be

25   killed before, so he told them okay.  He told the embassy:

1   Okay, I'm not going to do anything anymore.

2          But General Hamoud was receiving calls on a daily

3   basis that he needs to -- they want to take us from the ISF

4   and kill us, and he will not be responsible.

5   Q.   Mr. Samaha, let me just stop you there for a moment.

6   When you entered into the room where your wife was with

7   Captain Cezane and the interaction with the telephone

8   occurred, before entering there, had you been made specific

9   threats before you entered?

10  A.   Yes.  They told me they would bring my daughter and

11  detain her and torture her too.

12  Q.   And was that something that you told your wife?

13  A.   No.  I couldn't tell.  My wife was almost -- she was

14  collapsing, my wife; and I start and I fell three times.

15  They wanted to take me to the hospital, Your Honor.  And I

16  got nervous because I am an American citizen and they were

17  afraid if something happened, I die, and they're going to be

18  responsible.

19         So they brought me the doctor, medication,

20  everything.  And they told me:  We're not going to -- this is

21  too much.  It's going out of control.  I told them:  Why

22  don't you release us? They said:  The judge's order.  We

23  cannot release you, but we can make sure you don't get

24  killed.  That's all we can do.

25         And they told me:  Tell the embassy.  And we told

1   ambassador, we told the consul exactly what's going on.  They

2   were well aware of everything, every single detail.

3   Q.   When you indicated to Mr. Berkeley to dismiss the

4   lawsuit, what was the fear that would happen to you, your

5   wife, and your daughter?

6   A.   We're going to be killed for sure.  They will never let

7   us out.

8   Q.   I just want to be clear.  At that moment --

9   A.   You dismiss or you die.  That's it.  This is -- it was

10  very simple.

11  Q.   And at the moment that you expressed this to

12  Mr. Berkeley, your wife was next to you?

13  A.   She was screaming:  Don't dismiss.  Don't dismiss.  Call

14  the FBI.

15  Q.   Yes.  And at that particular point she was not aware of

16  the threat that had been made to your daughter; correct?

17  A.   No.

18  Q.   Mr. Samaha, what do you do professionally in Lebanon?

19  A.   I am an architect and real estate developer.

20  Q.   And do you own businesses in Lebanon?

21  A.   I used to own multiple companies before the defendant

22  closed it down.  They poured a concrete wall in front of my

23  main warehouse.

24  Q.   So your wife's inheritance is gone, the federal lawsuit

25  is dismissed, and in Lebanon your businesses were shutdown?

```
 1    A.   Yes.  And in addition to that, we were threatened, Your

 2    Honor.  If we come to court again and tell you what happened,

 3    they're going to sentence us to prison for a long term,

 4    they're going to take my properties, and they will probably

 5    send somebody after us to kill us here in the U.S.

 6    Q.   There came a point when you returned to the United

 7    States; correct?

 8    A.   Yes.

 9    Q.   And when approximately was that?

10    A.   April -- April 11th we were released.  The embassy told

11    me:  You need to leave immediately.  To send the airline

12    tickets.  And she was on the phone with me through what's up,

13    basically step by step.

14    Q.   Pardon me, but you're going through step by step --

15    A.   With Consul Cindy Wade.

16    Q.   -- with Consul Cindy Wade, and she's giving you

17    step-by-step instructions?

18    A.   Yes.  She's telling me:  Tell me when you leave the

19    house, when you enter the car, you reach the airport, you

20    pass customs, you're on the plane.  I mean she wanted to know

21    every single step.

22              And on the plane I think there was an FBI agent who

23    was keeping an eye on us until we reached London, and then we

24    didn't see him again.

25    Q.   All right.  Once you returned to the United States, did
```

1  you immediately file this motion to reinstate this case or to

2  vacate the final judgment?

3  A.   I'm not -- I'm not the plaintiff.  My wife, no, she --

4  we -- she thought about it because the consequences are

5  extreme.  I mean I know today -- after today is completely

6  different than yesterday.  I know they're going to do really

7  bad things to my family now, so she had to think.

8  Q.   Because of your testimony?

9  A.   Because me and my wife told the judge what happened.

10  Q.   All right.  But when you left Lebanon, all of your

11  money, your property was seized; correct?

12  A.   Right.

13  Q.   There came a point when you returned to the United

14  States and there was a period of time before your wife

15  actually instructed counsel to file this motion;

16  approximately two months?

17  A.   Right.

18  Q.   What was happening during that two-month period of time

19  that caused you and your wife to wait for the filing?

20  A.   Well, we had to consider the consequences, Your Honor,

21  of coming and telling you what happened.  It's extremely

22  dangerous for us to do that, so we had to really consider

23  that.  And also we had to sell some properties so we have

24  some money.

25  Q.   All right.  Were you able to sell finally some property?

1   A.   Yes.

2   Q.   And you obtained how much money?

3   A.   About 160,000.

4   Q.   And immediately after you obtained that money, how long

5   was it before --

6   A.   Days.

7   Q.   -- your wife then instructed your lawyer to file this

8   motion?

9   A.   Days.

10  Q.   All right.  So during that two-month period of time

11  after you returned, not only were you considering the

12  consequences, but you were also making arrangements to have

13  some money in your pocket?

14  A.   Right.  Exactly.

15       MR. VILLASANTE:  Okay.  I don't have anything

16  further, Your Honor.

17       THE COURT:  All right.  Defense.

18                    CROSS-EXAMINATION

19  BY MS. MASELLA:

20  Q.   Good morning, sir.

21  A.   Good morning.

22  Q.   I believe Mr. Villasante asked for the date of your

23  return to the United States, but I'm not sure we got it.

24  A.   April 11th.  April 11th they released us around

25  8:00 o'clock, we took the flight about April 12th, around

1   7:00 a.m.  Within a few hours we were on the plane, so I

2   think the 12th, April 12th.

3   Q.   You returned first to London and then to the United

4   States?

5   A.   Yes.  Yes.  Beirut, London, Miami.

6   Q.   And I think you told us that the lawsuit was dismissed

7   on your instructions to Mr. Berkeley; is that correct?

8   A.   Yes.  Yes.

9   Q.   And that your wife did not agree to that at that time?

10  A.   No.  No, she did not.

11  Q.   As far as you are aware, did Mr. Berkeley ever tell the

12  court that he dismissed the lawsuit pursuant to your

13  instructions at anytime after you returned on April 12th?

14  A.   I don't know.  I don't think so.

15  Q.   You're not aware?

16  A.   You have to ask him.  I don't know.

17  Q.   And you were not a party in the lawsuit; correct?

18  A.   I have nothing to do with the lawsuit.  They just took

19  me hostage so they can get the dismissal.

20          MS. MASELLA:  Nothing further, Your Honor.  Thank

21  you.

22          THE COURT:  All right.  Mr. Villasante.

23          MR. VILLASANTE:  Your Honor, we have no other

24  witnesses at this time.  I would just ask the Court to

25  consider the affidavit of Mr. Berkeley, which is docket

```
 1    Item 98-3.
 2              THE COURT:  All right.  Is there any objection to
 3    the Court's consideration of that affidavit?
 4              MS. MASELLA:  No, Your Honor.  No objection.
 5              THE COURT:  All right.  So the testimony of Ms.
 6    Mansour, Mr. Samaha, and the affidavit of Mr. Berkeley at
 7    docket entry 98-3 is the plaintiff's evidence in the case?
 8              MR. VILLASANTE:  Yes, Your Honor.
 9              THE COURT:  All right.  Now let me hear from
10    defense.
11              MS. MASELLA:  Thank you, Your Honor.  We have an
12    affidavit, a declaration of a Lebanese attorney for the
13    Court's consideration in this matter.  We've marked it as
14    Exhibit 1, and we provided a copy to Mr. Villasante this
15    morning shortly after we received it.
16              It goes to the point of -- the point of foreign
17    law, which this Court is permitted to consider any source
18    under Rule of Civil Procedure 44.1 in terms of making its
19    determination as to what is foreign law and what it permits
20    in this case.  And it goes to the point of whether in Lebanon
21    it is permissible and legal to detain someone who is charged
22    in a criminal case there, in addition to someone who might be
23    a witness in that case.
24              So we would request that we be permitted to submit
25    this for the Court's consideration on the point of foreign
```

1    law.

2              THE COURT:  Generally when there is foreign law

3    involved and the parties seek for the Court to be advised of

4    that foreign law, in my experience in other cases, each side

5    has presented attorneys or people as such with that

6    expertise.

7              You're proposing that I just take your foreign law

8    expert's declaration without any input from the plaintiff?

9              MS. MASELLA:  No, Your Honor.  Just to be clear; we

10   did raise the same points that we're making in this

11   declaration in the declarations of the defendants in the

12   case, who are also judges, and the former minister of justice

13   in Lebanon, with the required expertise back in July when we

14   submitted our opposition in this case.

15             And the plaintiff, as far as I am aware, never

16   retained an expert or submitted anything along those points.

17   This is merely one additional declaration, which comes from

18   an independent lawyer, who is not a defendant in the case.

19             But the others are qualified lawyers in Lebanon,

20   who make all of the same points in their declarations; which

21   are dated, I believe, July 24th.  Many months ago.

22             THE COURT:  I'm sorry.  I didn't mean to interrupt

23   you.  Were their declarations submitted under Rule 44.1 for

24   the Court's benefit of what foreign law is; or were they

25   submitted as defendants in the case?

1          MS. MASELLA:  They were submitted as defendants in

2     the case, Your Honor.

3          THE COURT:  So this issue of foreign law as such

4     has not arisen until you provided this morning to plaintiff

5     the affidavit.

6          So my question to you is:  Are you anticipating

7     that the Court accept your foreign law expert's affidavit

8     without any response from plaintiff?

9          MS. MASELLA:  We are requesting that the Court

10    accept this.  If the plaintiff wishes to respond, we do not

11    object to that.

12         THE COURT:  All right.

13         MR. VILLASANTE:  Your Honor, the matter was set for

14    hearing today as an evidentiary matter.  This was handed to

15    me in the morning.  Clearly there is a procedure.  There is a

16    rule that must be followed before this is a proper submittal,

17    so we object to it on the whole.

18         I have no opportunity to cross-examine this

19    witness, the qualifications, the nature of any relationship

20    that that witness may have with defendants.  It is very, very

21    problematic to simply submit at this late hour an affidavit

22    from someone purportedly an expert in the exact type of

23    field.

24         Moreover, what we have for the Court today is

25    beyond the status of the law in Lebanon.  So we clearly

1  oppose any idea that -- that anything that happened in terms

2  of the detention was lawful.  But even so, what cannot be

3  considered lawful by any court is torture; putting people in

4  Al Qaeda cells so that they then dismiss a federal lawsuit

5  here.

6          That's beyond the initial question of whether or

7  not the detention may or may not have been lawful.  For

8  purposes of what we're here for today, as I understand it,

9  Your Honor, is to determine whether or not the arrest was

10  such -- that circumstances were such that vitiate this final

11  judgment.  In other words:  Was it introduced under duress or

12  not?  And clearly it was.

13          The initial detention is not at issue for today.

14  What's at issue only is the dismissal and the circumstances

15  and the conditions and the facts leading to that dismissal.

16  End of issue.

17          THE COURT:  So how is this affidavit that I haven't

18  seen relevant to the Rule 60 motion for relief from judgment?

19          MS. MASELLA:  Yes, Your Honor.  So it's the

20  plaintiff's burden to show duress.  It is our position that a

21  lawful detention pursuant to the laws of the criminal matter

22  in Lebanon negate the duress.  So it is really up to the

23  plaintiff as to whether he wants the opportunity to present

24  additional evidence on the point of whether the detention was

25  lawful or not.

```
 1              THE COURT:  I'm sorry.  Let me see if I understand
 2     you correctly.
 3              You're relying on an attorney who is an expert on
 4     Lebanese law --
 5              MS. MASELLA:  Yes, Your Honor.
 6              THE COURT:  -- to state that it is lawful for
 7     Lebanese authorities to detain somebody on some charge?
 8              MS. MASELLA:  Correct.  That there was an arrest
 9     warrant issued for Ms. Mansour in connection with criminal
10     charges in Lebanon, that it is lawful to detain somebody for
11     a period of up to several months, and that it is also lawful
12     to detain somebody who might be a witness -- such as her
13     husband -- in the criminal matter in Lebanon.
14              THE COURT:  And does your expert state anywhere in
15     his affidavit that Lebanese law condones the circumstances of
16     detention that have been described in this courtroom?
17              MS. MASELLA:  It does not address the
18     circumstances, the particular circumstance that Ms. Mansour
19     and her husband testified about today, no.
20              THE COURT:  So how does that affidavit counter the
21     plaintiff's claim of duress?
22              MS. MASELLA:  It's up to -- well, we dispute that
23     the circumstances occurred exactly the way that the plaintiff
24     and her husband testified.
25              THE COURT:  Have you presented any evidence to
```

 1    dispute that?

 2         MS. MASELLA:  No, Your Honor.  The evidence that we

 3    presented demonstrates that our defendants -- our clients

 4    rather, the Lebanese government officials, were unaware of

 5    those circumstances.

 6         THE COURT:  Okay.  But I don't think that that's

 7    material to the issue of whether this was done under duress

 8    or not.  I think that's something else.  Wouldn't you agree?

 9         MS. MASELLA:  It's another point, certainly, for

10    the Court to consider.

11         Our point is that the detention itself is lawful in

12    these circumstances.

13         THE COURT:  That the detention under the

14    circumstances described by Mrs. Mansour and Mr. Samaha was

15    lawful under Lebanese law?

16         MS. MASELLA:  No, Your Honor.  It does not take

17    into account the particular circumstances that there was

18    testimony about.

19         THE COURT:  So because the affidavit that is being

20    submitted does not address the issue of duress, I will not

21    consider it.

22         MR. VILLASANTE:  Yes, Your Honor.

23         THE COURT:  All right.  Thank you very much.  So do

24    you have anything else?

25         MS. MASELLA:  No, Your Honor.  Thank you.

1        THE COURT:  All right.  I will take just a very

2   brief break; ten minutes.  I will hear argument from the

3   plaintiff on what rule they're traveling under and how

4   they -- how she believes she has satisfied that rule, and

5   then I will hear from what we're calling the Lebanese

6   defendants.

7        Let me clarify something.  You have entered an

8   appearance for these individuals.  I was looking over the

9   docket.  What is the status of service?  I know you've argued

10  personal jurisdiction and all those things.  But have they

11  been served, or have you made your appearance reserving?

12  Because I looked over the notice of appearance, and I didn't

13  see any reservation there.  So can you clarify that for me.

14       MS. MASELLA:  Thank you, Your Honor.  Yes, we are

15  reserving our argument with respect to service.  Service was

16  made pursuant to UPS internationally, which we argue is not

17  sufficient under the Hague Convention.  It is not proper

18  service.

19       THE COURT:  Okay.

20       MS. MASELLA:  We're also reserving personal

21  jurisdiction arguments, as well as subject matter

22  jurisdiction argument, which does not need to be reserved.

23  It can be heard by the Court at anytime.  We're reserving all

24  those issues, Your Honor.

25       THE COURT:  All right.  But am I correct that the

1    notice of appearance did not contain any reservations?

2              MS. MASELLA:  One moment, Your Honor.  We're

3    checking the notice.  We're unsure about that.

4              THE COURT:  That's what I'm looking for also.

5              MS. MASELLA:  We believe we did include it with our

6    initial opposition to the motion.

7              THE COURT:  I kind of glanced at it while I was

8    looking at things before, so I see a motion to appear pro hac

9    vice and an order granting it.

10             MS. MASELLA:  Yes, Your Honor.  That was my motion

11   to appear pro hac.  Mr. Samra appeared much earlier in the

12   case.  We're looking right now.

13             THE COURT:  I have a notice of appearance by Mr.

14   Samra dated July 17th.

15             MS. MASELLA:  We're looking at it now.  We did not

16   include it in the notice.  We did include it in our

17   opposition to the plaintiff's motion.

18             THE COURT:  Okay.

19             MS. MASELLA:  We would request that we be permitted

20   to reserve the objection to --

21             THE COURT:  I'm not going to make that ruling.  You

22   can argue about that.  I was just trying to determine what

23   posture the defendants were in.

24             MS. MASELLA:  Thank you, Your Honor.

25             THE COURT:  All right.  So I will allow -- let's

 1    just take a ten-minute break, and then I will allow ten

 2    minutes per side.

 3          And, as I said, the issue before the Court now is

 4    whether to recommend to Judge Martinez to grant the motion

 5    for relief from judgment.  All right?

 6          MR. VILLASANTE:  Yes, Judge.

 7          THE COURT:  Thank you.

 8          (Recess)

 9          THE COURT:  All right.  Mr. Villasante, do you want

10    to reserve any of the ten minutes I'm granting you?

11          MR. VILLASANTE:  No, Your Honor.  I think I can be

12    brief.  If I may proceed?

13          THE COURT:  Go ahead.

14          MR. VILLASANTE:  If your question was to reserve --

15          THE COURT:  For rebuttal.

16          MR. VILLASANTE:  -- I'll reserve two minutes, Your

17    Honor.  Thank you.

18          THE COURT:  All right.

19          MR. VILLASANTE:  Judge, our motion is a Rule 60(b)

20    motion for relief from a judgment or order.  In this

21    particular case the issue is whether or not the decision to

22    dismiss this case was made under duress.  And the case law

23    that was cited by my prior counsel in the memorandum is

24    exactly on point, and it stresses that this is a matter that

25    is liberally construed to be well-within the discretion of

1       the Court.

2                 And the circumstances in this case are particularly

3       gruesome; if I may describe it that way.  This is an unusual

4       set of facts, which the case law addresses, and it permits

5       for the vacation of a final judgment specifically under those

6       circumstances.

7                 This is a foreign entity torturing an American

8       citizen and an American permanent resident to dismiss a

9       federal matter in the United States of America.  I can't

10      imagine anything much more offensive than that to happen

11      before this Court.

12                Not only did they require a dismissal of the

13      pending litigation against the defendants, they were

14      requiring it to be with prejudice and they were requiring

15      that the defaulted parties -- whom no one represented at the

16      time apparently -- also be dismissed from this lawsuit.

17                The only question before the Court -- and I think I

18      can be as brief as this.  It's all addressed in the case law

19      that we have previously cited to the Court.  It's a

20      Rule 60(b) motion.  And relief from judgment is permitted

21      when the circumstances are such that we can demonstrate that

22      the decision was made under duress.

23                I can't imagine that what we heard today as

24      testimony can be qualified or described as anything other

25      than extreme duress, and this is what these people went

1    through.  And Mrs. Samaha particularly -- Mrs. Mansour -- had

2    the courage to try to keep this lawsuit pending; even through

3    a substantial part of her horrific experience and torture;

4    and yet was forced to do so once her child was involved.

5          Her husband was the one who made that decision, but

6    it was clearly because the circumstances had arisen to that

7    level.

8          Your Honor, there is really no more argument to

9    make.  The duress was the primary reason why and the only

10   reason why this matter was dismissed.  We ask that the Court,

11   within its discretion, give us relief from that judgment and

12   allow this matter to go forward on the merits.

13         There will be other arguments, there will be other

14   days, there will be other things that will happen.  But if we

15   reopen this right now and obtain a relief from this judgment,

16   all of those matters can be addressed at another time on

17   another day.

18         THE COURT:  All right.  Go ahead.

19         MS. MASELLA:  Thank you, Your Honor.  Starting with

20   respect to the point of duress, based on the testimony that

21   we heard today, as well as the affidavits entered in the

22   case, the actual circumstances of the dismissal of the

23   lawsuit are slightly unclear.  And we don't have the

24   testimony -- the live testimony of the attorney Lorne

25   Berkeley, who actually filed the notice for dismissal.

1    By that I mean, we heard testimony that the

2    plaintiff herself did not agree to the dismissal of the

3    lawsuit but that her husband instructed Mr. Berkeley to file

4    for dismissal.  Her husband is not a party to the lawsuit

5    and, as far as I know, is not a client of Mr. Berkeley then

6    in connection with this case.

7    The plaintiff and her husband returned to the

8    United States on April 12th.  Mr. Berkeley is an attorney and

9    an officer of this court; and, as far as we're aware, he

10   never provided any notice to the Court that he dismissed a

11   lawsuit on the instructions of someone other than his client

12   in the case.  And he was not here today to submit to

13   testimony to be questioned about that.

14   So the plaintiff has the burden of showing that the

15   duress led to the actual dismissal of the lawsuit, and the

16   testimony that we have so far is that the attorney of record

17   agreed to a dismissal on the instructions from someone other

18   than his client.

19   Backing up to the bigger picture, Mr. Villasante

20   refers to other arguments and other days if this case were to

21   be reinstated and the dismissal vacated.  But we submit, Your

22   Honor, that it would be completely futile for the Court to

23   vacate the dismissal because there are issues that are

24   threshold issues that are so big in this case that are

25   deficient that the case cannot proceed; even if it were --

1    even if the dismissal were to be vacated.

2          The first of these is subject matter jurisdiction

3    which, as the Court is likely aware, if at any point subject

4    matter jurisdiction is lacking in a case, the Court does not

5    have the authority to proceed.

6          In this case the plaintiff has pled diversity

7    jurisdiction as the basis for the subject matter jurisdiction

8    in the case.  But in order to have diversity jurisdiction,

9    you need to have a United States citizen on either side of

10   the case, and the plaintiff has conceded that she is not a

11   United States citizen; that she may be a permanent resident

12   here, but she's not a citizen.  And there is clear case law

13   saying that permanent residency, while it confers other

14   benefits here in this country, is not relevant for subject

15   matter jurisdiction.

16         At the heart in this case, Your Honor, is a lawsuit

17   that originated in Lebanon over disputes relating to the

18   estate of the plaintiff's father, which is property in

19   Lebanon, after he died in Lebanon among her and her various

20   family members, all of whom reside in Lebanon.  And so that

21   makes clear, we think, that there is no reason for this case

22   to be proceeding in U.S. court here, and that there is in

23   fact no subject matter jurisdiction for the Court to have

24   authority to proceed.

25         We've also raised the issues of personal

1    jurisdiction, as well as service.  Those issues we think

2    would also be clear but would require additional factual --

3    an additional factual record, which was never -- we never got

4    to that point in this case because the complaint was

5    dismissed before any of the parties responded or filed

6    substantive motions in the case.  And that's why, Your Honor,

7    we're here in somewhat of an unusual procedural posture,

8    raising issues such as subject matter jurisdiction, lack of

9    proper service, and personal jurisdiction, because the case

10   was dismissed before any of those -- before the time for

11   raising any of those issues in a substantive way and in a way

12   that they could be fully briefed was done.

13          With respect to Your Honor's earlier question about

14   the notice of appearance and the service argument, we did

15   not -- both of the notices of appearance that were done in

16   the case were rather short and boilerplate.  But on March 12,

17   2019 -- which was the same day we filed our first notice of

18   appearance in the case, and that was by Mr. Harout Samra, who

19   is here with me this morning -- he filed on that same date a

20   motion for extension of time to respond to the complaint.

21   And in that motion there is a footnote addressing the issue

22   of service and reserving the right to raise an argument about

23   improper service at the appropriate time.

24          So in that motion we are asking for additional time

25   to respond to the complaint.  The service argument was

1    raised.  In fact, we never responded to the complaint because

2    the lawsuit was dismissed before the time to respond came up.

3            So, Your Honor, just to sum up, we do not believe

4    that the plaintiff has met its burden with respect to duress

5    because it's not clear how the instruction from the

6    husband -- her husband rather, to the lawyer resulted in a

7    dismissal of the lawsuit, over and above her wishes.  Mr.

8    Berkeley is not here present in court to testify about the

9    circumstances and to shed light on that, and that it would be

10   futile to vacate the dismissal in this case because of the

11   critical threshold issues of subject matter jurisdiction,

12   personal jurisdiction, and service, all of which are

13   deficient in the case.

14           THE COURT:  All right.

15           MR. VILLASANTE:  Your Honor, we're here on a

16   Rule 60(b) motion to vacate a final -- relief from a final

17   judgment.

18           All the issues on jurisdiction are not before the

19   Court today.  While subject matter jurisdiction can be raised

20   at anytime, it must be raised with adequate notice and

21   fulfilling all the due process requirements to which my

22   client is entitled.  So if that is an argument that is being

23   made today, it's an argument that is not before the Court

24   when there has not been the proper due process notice, et

25   cetera, made to my client.

1          With respect to the duress, there isn't any

2    question but that the circumstances were such that it was so

3    confusing and so horrific for both of them that while Mrs.

4    Mansour was attempting to be strong, regardless, the

5    circumstances were of extreme duress.  This was not just a

6    normal phone call to her attorney where things can be

7    considered and, you know, decided.

8          There is an affidavit of Mr. Berkeley, it is very

9    complete, and I ask the Court to read it.  Now, Mr. Berkeley,

10   unfortunately, became a witness in this case as a result of

11   all this; therefore, I have substituted in.  And I think it

12   is in our judgment best not to risk any attorney-client

13   privilege communications by having Mr. Berkeley come to

14   testify when we have a full and complete affidavit from him

15   that I think will shed light for the Court.

16         But with respect to the jurisdictional arguments,

17   again, Your Honor, that's argument for another day once this

18   matter is reinstated.  Thank you.

19         THE COURT:  All right.  Anything else from either

20   side?

21         MS. MASELLA:  Just very briefly, Your Honor.  With

22   respect to our arguments on jurisdiction, they were raised in

23   all of our papers and all the various motions.  We discussed

24   them with Mr. Villasante during the meet-and-confer sessions

25   that he referred to during the past few weeks.

1          And, finally, subject matter jurisdiction can be

2    raised at anytime by any party or the Court.  There is no

3    conclusion that it cannot come up in a 60(b) context.  In

4    fact, it can come up at anytime, in any proceeding, and/or

5    may be raised by the court on its own.  Thank you, Your

6    Honor.

7          THE COURT:  All right.  Thank you very much.

8                    C E R T I F I C A T E

9        I certify that the foregoing is a correct transcript

10   from the record of proceedings in the above-entitled matter.

11

12   October 24, 2019                /s/ Vernita Allen-Williams

13

14

15

16

17

18

19

20

21

22

23

24

25