UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 17-24206-CIV-MARTINEZ-OTAZO-REYES

LARA SAMAHA and ELIE SAMAHA,

                Plaintiffs,

         v.

GEBRAN BASSIL,
SALIM JREISSATI,
DANY MACARON,
ZIAD MEKANNA,
PETER GERMANOS,
MAJED BOUEZ,
AHMAD SASSINE,
MONA BACH MANSOUR,
ALEXANDER GEORGE MANSOUR, and
ROLLY GEORGE MANSOUR,

               Defendants.

JURY TRIAL DEMANDED

**PLAINTIFFS' SUPPLEMENTAL COMPLAINT**

**NATURE OF ACTION**

1.       In April 2019, family members of Plaintiff Lara Samaha lured Lara and her husband, Elie, from their home in Miami to Beirut, Lebanon where they were kidnapped and tortured by Lebanese government officials acting at the family members' behest. For ten days, Plaintiffs were held captive and subjected to repeated physical and psychological torture in an effort to coerce them to dismiss claims brought by Lara Samaha in United States federal court. This action is brought under the Alien Tort Statute ("ATS") and Torture Victim Protection Act of 1991 ("TVPA") to redress the harm Plaintiffs suffered from their kidnapping and torture.

2.       Defendants' plot to kidnap and torture Plaintiffs was part and parcel of efforts by Mrs. Samaha's family to steal millions of dollars from Mrs. Samaha that she is entitled to inherit from her father and her aunt. When Mrs. Samaha instituted legal action in Lebanon to obtain her inheritance, her family members destroyed evidence and corrupted the judicial process to stymie those efforts. This forced Mrs. Samaha to turn to the U.S. courts for redress: in 2017, she filed suit in this Court in an effort to recover her rightful inheritance (the "U.S. Lawsuit"). Then, at the behest of her well-connected family members, Lebanese prosecutors brought defamation charges against Mrs. Samaha as payback for exercising her legal rights. Certain of the Defendants filed complaints against both Mrs. and Mr. Samaha, because in the words of one Defendant, the U.S. Lawsuit "touched the pride and reputation" of the Defendants.

3.       Not content with perverting the Lebanese judicial process, Defendants proceeded to lure Plaintiffs to Lebanon in the guise of seeking to resolve the inheritance dispute. Upon arriving in Beirut for a purported "settlement meeting," Mrs. Samaha was immediately and unlawfully detained by an awaiting border control officer

from the General Directorate of General Security and transported to an underground military prison without access to light, food, water, or medication. Mr. Samaha was subsequently taken into custody as well. Over the next ten days, Defendants subjected Plaintiffs "to kidnapping, harsh interrogation, and cruel torture-like tactics . . . with the sole intention of forcing [Mrs. Samaha] to dismiss the Amended Complaint that was filed before this Court."  May 27, 2020 Order Adopting Magistrate Judge's Report and Recommendation at 2. [*See* ECF No. 140]. At one point, Mrs. Samaha was forced to remove all of her clothing, and later, she was forced to listen as other prisoners were tortured just steps away. Defendants threatened her with a range of extrajudicial punishments, including death, unless she abandoned her efforts to seek justice in the United States.

4.    After days of illegal detention in inhumane conditions, without any formal charges, while under constant threat of physical harm and possible death, Plaintiffs finally acceded to Defendants' extortion and dismissed the U.S. Lawsuit.  As the Court has found, this dismissal was "the product of duress and coercion."  May 27, 2020 Order at 2. [ECF No. 140]. Only after Defendants independently confirmed that Mrs. Samaha had dismissed the U.S. Lawsuit were Plaintiffs released from captivity. To this day, Plaintiffs continue to suffer from the physical harm and the severe mental trauma that Defendants inflicted.

5.    Defendants acted in concert to torture Plaintiffs and are thus jointly liable to Plaintiffs under the ATS and the TVPA. Torture specifically violates the law of nations within the meaning of the ATS, as well as the TVPA. In 1984, the United Nations General Assembly promulgated the Convention Against Torture and Other Cruel,

2

Inhuman or Degrading Treatment or Punishment ("Torture Convention"), to which an overwhelming majority of countries are parties. The Torture Convention is part of the law of nations for ATS purposes. Under the Torture Convention, it is an offense to inflict severe physical or mental pain or suffering on a person for purposes of intimidation. Defendants, acting in concert, engaged in such torture here in an effort to intimidate and coerce Mrs. Samaha into abandoning a United States property interest: the U.S. Lawsuit.

## PARTIES

### A. Plaintiffs

6.       Plaintiff Lara Samaha ("Mrs. Samaha"), also known as Lara George Mansour, is a citizen of Lebanon, a United States permanent resident, and a resident of Florida. Mrs. Samaha is the daughter of George Mansour and Mona Bach Mansour.

7.       Plaintiff Elie Samaha ("Mr. Samaha") is a United States citizen and a resident of Florida. Mr. Samaha was born in Lebanon, where he resided until 1982, when he moved to the United States.

### B. Defendants

#### a. The Family Defendants

8.       Defendant Mona Bach Mansour is Mrs. Samaha's mother. Mona Bach Mansour is a citizen and resident of Lebanon.

9.       Defendant Alexander George Mansour is Mrs. Samaha's brother. Alexander George Mansour is a citizen and resident of Lebanon.

10.       Defendant Rolly George Mansour is Mrs. Samaha's sister. Rolly George Mansour is a citizen and resident of Lebanon.

11.     Defendants Mona Bach Mansour, Alexander George Mansour, and Rolly George Mansour (collectively, the "Family Defendants") are the living members of Mrs. Samaha's immediate family.

### b.  The Lebanese Government Defendants

12.     Gebran Bassil is a Member of the Lebanese Parliament. He is the leader of the Free Patriotic Movement ("FPM") political party. As head of the FPM, Bassil is a close ally of Lebanese President Michel Aoun and exerts significant control over the Lebanese judiciary,[1] ministers of various governmental departments, and other government posts. Bassil has a deep network within the Lebanese political structure and previously held numerous governmental posts, including Minister of Telecommunications, Minister of Energy and Water, and Minister of Foreign Affairs and Emigrants. Bassil is married to Chantal Aoun, the daughter of President Aoun. Bassil has received compensation from the Family Defendants and he, in turn, used his power to direct the kidnapping and torture of Plaintiffs.

13.     Salim Jreissati is a Lebanese politician and a member of the Free Patriotic Movement. As a member of the FPM, he is loyal to Bassil. He currently serves as Lebanon's State Minister for Presidential Affairs. Between December 2016 and January 2019, Jreissati served as Minister of Justice. As Minister of Justice, Jreissati developed deep connections within the law enforcement community and judicial system of Lebanon. Since January 2019, Jreissati has served as Minister for Presidential Affairs.

---

[1] The judiciary in Lebanon is divided into four main court systems, each having a multilevel hierarchical structure. The system referred to in this Complaint is the equivalent of the United States District Court system.

4

Using his connections, Jreissati implemented Bassil's directive to orchestrate the kidnapping and torture of Plaintiffs.

14.     Dany Macaron is a Lebanese attorney who represents the Family Defendants. In that role, and with full knowledge that Plaintiffs had been kidnapped and tortured, Macaron conducted negotiations with Plaintiffs' attorney to obtain the ransom that Defendants demanded as a condition of Plaintiffs' release from captivity and cessation of torture: dismissal of the U.S. Lawsuit.

15.     Ziad Mekanna is a member of the FPM, who owes his loyalty to Jreissati. To facilitate Defendants' scheme to kidnap and torture Plaintiffs, Mekanna filed spurious defamation claims against Plaintiffs to serve as a pretext for their kidnapping and torture.

16.     Peter Germanos was Lebanon's top military prosecutor in Lebanon until January 2020. In June 2019, Germanos was suspended after an investigation into judicial corruption. Germanos was responsible for implementing orders from Bassil and Jreissati to transfer Plaintiffs to specific detention facilities so they could more easily be killed. Even after Plaintiffs paid the ransom Defendants demanded (by dismissing the U.S. Lawsuit), Germanos sought to prevent Plaintiffs' release.

17.     Majed Bouez is a Lebanese attorney who represents the Free Patriotic Movement and its members, including Bassil. Bouez made false representations to lure Plaintiffs from their home in Miami to Lebanon so that they could be kidnapped and tortured.

18.     Ahmad Sassine is the Captain of Lebanon's Internal Security Forces Directorate. At the direction of other Defendants, Sassine held Plaintiffs captive

and interrogated them. Sassine was responsible for the conditions of Plaintiffs' captivity, and refused to release Plaintiffs until Mrs. Samaha dismissed the U.S. Lawsuit.

## JURISDICTION AND VENUE

19.    This Court has jurisdiction over Plaintiffs' ATS and TVPA claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1350. The Court has supplemental jurisdiction over Plaintiffs' other claims pursuant to 28 U.S.C. § 1367.

20.    Venue is proper in this District pursuant to 28 U.S.C. § 1391. Defendants communicated with Plaintiffs in this District to lure them to leave this District so that Defendants could deprive them of their right to pursue the U.S. Lawsuit filed in this District. Pursuant to 28 U.S.C. § 1391(b)(1)-(2), there is no other district in which venue is proper.

21.    This Court has personal jurisdiction over Defendants because Plaintiffs' claims are based, *inter alia*, on Defendants' purposeful acts to lure Plaintiffs from their home in this District and then to deprive Mrs. Samaha of property sited in this District: the U.S. Lawsuit. Defendants were aware of the U.S. Lawsuit and their conduct was purposefully directed at causing Plaintiffs to abandon that United States property interest sited in this District. Defendants, by kidnapping and torturing Plaintiffs, intended to and did cause the dismissal of the U.S. Lawsuit.

22.    Adjudication of Plaintiffs' claims in the United States is especially appropriate because the claims cannot be fairly adjudicated in Lebanon. Defendants control the outcome of any claims that Plaintiffs could assert in Lebanon. Defendants have substantial influence over judicial functions in Lebanon. Specifically, Gebran Bassil, as the leader of the dominant political party, exercises significant control over the country's judiciary.

23.     Due to Defendants' significant influence over Lebanese judicial functions, Lebanese courts do not provide an adequate forum to adjudicate Plaintiffs' claims, which are based on Defendants' misconduct, including through abuse of the Lebanese judicial system.[2] A system subject to the control of Defendants cannot fairly adjudicate claims where Defendants have already demonstrated their ability to maneuver the outcome of Lebanese judicial proceedings to their own benefit.

24.     Plaintiffs' inability to obtain relief in Lebanon is exacerbated by the fact that political corruption and bribery is notorious in Lebanon. According to Transparency International's Corruption Perceptions Index, Lebanon is more corrupt than over 135 other countries, including Brazil, Russia, Iran, and Kazakhstan.

25.     Corruption and bribery have specifically blocked Plaintiffs' efforts to obtain redress in Lebanon for injuries resulting from Defendants' actions. Defendants exert substantial control over military, political, and judicial functions in the country. Plaintiffs have repeatedly raised issues concerning this conduct with the Lebanese authorities, and have repeatedly been ignored.

## FACTUAL ALLEGATIONS

### A.  Defendants Kidnap and Torture Plaintiffs to Extort Dismissal of the U.S. Lawsuit.

26.     In early 2019, Defendants, acting in concert, concocted a plan to induce Plaintiffs to leave their home in Miami to travel to Lebanon, where Defendants

---

[2] Lebanon is a country characterized by the United States as one that has a legal structure that provides for the prosecution and punishment of officials who committed human rights abuses but, nevertheless, a country where enforcement remains a problem, and government officials enjoy a measure of impunity for human rights abuses. U.S. Dep't of State, Bur. of Democracy, Human Rights, and Labor, *Country Reports on Human Practices* (2018).

planned to kidnap and torture them Defendants did so to coerce the dismissal of the U.S. Lawsuit.

### a.  **Mrs. Samaha Tries to Obtain Her Lawful Inheritance.**

27.     Despite her entitlement to a significant inheritance, Mrs. Samaha's attempts to obtain that inheritance through the Lebanese judicial system were fruitless. After repeated failures, Mrs. Samaha commenced litigation in this Court.

28.     On November 17, 2017, Mrs. Samaha filed the U.S. Lawsuit, asserting claims against her family members and Lebanese officials who conspired with them to defraud Mrs. Samaha of her rightful inheritance. [*See* ECF No. 1]. Mrs. Samaha filed an Amended Complaint on October 17, 2018. [*See* ECF No. 7].

29.     For months thereafter, Defendants failed to respond to the lawsuit. In January 2018, Defendants became increasingly frustrated by Mrs. Samaha's pursuit of her rights in United States court. Consequently, Jreissati met with General Abbas Ibrahim, Head of the General Directorate of General Security (Lebanese border control) at the presidential palace, where Jreissati expressed his concern regarding the U.S. Lawsuit. Over the ensuing year, Jreissati's frustration with the U.S. Lawsuit grew, so much so that he told Mr. Samaha's cousin that he had "advice" for Mr. Samaha: to distance himself from Mrs. Samaha's claims, because her pursuit of her claims would be "very dangerous."

30.     As a result of this frustration with Plaintiffs' pursuit of justice, Defendants have instituted spurious legal claims in Lebanon, including claims by Mekanna and Macaron for criminal defamation, to pressure Mrs. Samaha into renouncing her legal claims and rights. Mrs. Samaha was unlawfully and unjustly accused of defaming Defendants by bringing her claims in the United States.

b.  **Defendants Lure Mrs. Samaha to Lebanon.**

31.    In March 2019, Majed Bouez, at the request of Gebran Bassil,
informed Plaintiffs that the Family Defendants were prepared to resolve Mrs. Samaha's
claims over her inheritance. This was a farce. The Family Defendants communicated a
willingness to engage in settlement discussions solely to lure Plaintiffs to Lebanon in
order to kidnap and torture them so that they would dismiss the U.S. Lawsuit and
relinquish any inheritance claim.

32.    The Family Defendants planned Plaintiffs' kidnapping and torture,
but needed the assistance of the Lebanese Government Defendants to execute their plot.
The Family Defendants bribed Bassil and Jreissati to garner their assistance in directing
Plaintiffs' kidnapping, torture, and interrogation. With their plot in place, the Family
Defendants proceeded to lure Plaintiffs to Lebanon.  They conscripted Defendant Bouez
to propose a settlement conference. Unaware of Defendants' plot, Plaintiffs took the bait
and traveled to Lebanon, arriving on April 2, 2019.

33.    To provide a pretext for kidnapping Plaintiffs, Mekanna and
Macaron brought charges for criminal defamation against Mrs. Samaha based on her
allegations in the U.S. Lawsuit, even though there was no legitimate basis for such
claims. Upon learning of the plot to induce Plaintiffs to come to Lebanon, Mekanna and
Macaron renewed summonses issued against Mrs. Samaha based on their defamation
allegations. They did so, in coordination with Defendants Bassil and Jreissati, to ensure
that the Plaintiffs could be detained upon their arrival in Lebanon.

34.    Upon landing in Beirut, Plaintiff Lara Samaha was immediately
and unlawfully detained by border control agents on the putative basis of the lawsuits

9

filed by Mekanna and Macaron. In reality, Mrs. Samaha was detained because she filed a

lawsuit against the Family Defendants and Lebanese officials in the United States.

35.     While detained, Mrs. Samaha was separated from her husband.

Agents brought Mrs. Samaha to an office and immediately confiscated her mobile phone.

After twenty minutes, three soldiers arrived. They held Mrs. Samaha at gunpoint before

bringing her to the Surety General Detention Center in Beirut. Defendants Bassil and

Jreissati directed Mrs. Samaha's arrest and transport to the detention center, and directed

their representatives to observe the arrest and transport to ensure that it occurred in

accordance with their instructions.

36.     Prisons in Lebanon are overcrowded and lack adequate sanitation,

ventilation, and lighting. However, the conditions of Plaintiffs' detention were inhumane

even by Lebanese standards. At the detention center, Mrs. Samaha was forced into a

small 7-foot by 9-foot cage in a room with no lights or windows. The room was stifling

hot. Upon her arrival at the prison, Mrs. Samaha was held in that cage for more than 12

hours and refused access to food, water, or toilet facilities.

37.     During that time, Defendants ignored Mrs. Samaha's health. Mrs.

Samaha has diabetes and requires regular access to food to maintain safe blood sugar

levels. Defendants, including Jreissati and Macaron, inflicted physical harm on Mrs.

Samaha by ordering guards to deprive Mrs. Samaha of access to food and to her

medication, to the point that she lost consciousness at least twice, and experienced heart

palpitations, cold sweats, numbness, and other medical conditions that required

immediate medical attention, which she was denied. She was in pain and screamed to

alert her captors to her condition. Despite Mrs. Samaha's deteriorating health, Defendants

ordered guards not to address her condition, and instead left her to remain in severe physical pain.

38.     In addition to physically torturing Mrs. Samaha, Defendants also ordered guards to subject her to severe mental pain and anguish. While Mrs. Samaha remained in captivity, guards tortured others nearby so that Mrs. Samaha was forced to watch and listen. Mrs. Samaha repeatedly heard sounds of male guards physically abusing female prisoners. Jreissati, in coordination with the other Defendants, directed these acts to inflict severe mental suffering on Mrs. Samaha. As a result of witnessing these attacks, Mrs. Samaha suffered, and continues to suffer, severe mental anguish.

39.     As her detention continued, Mrs. Samaha heard the screams of other prisoners echoing from the walls, and she saw the guards stalk past her cage with large hunting knives, tapping them across the bars of her cage. Defendants directed these acts in order to intimidate and coerce Mrs. Samaha. As Mrs. Samaha mentally prepared herself to be killed at the hands of her captors, her pain level rose to the point that she was no longer able to suffer in silence, and she began to scream aloud. In response, a prison guard approached and demanded that she explain why she was screaming so loudly. Mrs. Samaha explained that she was experiencing severe pain and was having trouble breathing because she had diabetes and did not have access to food or to her medication. The guard ignored her pleas for medical attention and instead yelled at her to be quiet, threatening her with his knife if she continued to make noise. The guard told Mrs. Samaha that nobody would help her. Defendants Bassil and Jreissati expressly directed the guards to ignore Mrs. Samaha's physical pain and mental distress.

40.     Unaided and alone, Mrs. Samaha was kept in this small cage overnight, without food, water, or essential medication.

41.     On the morning of April 4, 2019, Mrs. Samaha was transferred to a second detention facility under the supervision of Lebanon's Internal Security Forces Directorate ("ISF"). The ISF is Lebanon's national police force. The ISF facility to which Mrs. Samaha was transferred houses Lebanon's most dangerous criminals, including suspected and convicted terrorists.

42.     When Mrs. Samaha arrived at the ISF facility, she was stripped naked in the presence of two ISF officers. Mrs. Samaha resisted until she was threatened with physical violence if she continued to refuse. After her clothing was removed, Mrs. Samaha remained naked in front of the officers for several minutes, during which she sobbed from embarrassment and humiliation while the officers talked and laughed.

43.     Defendant Bassil, through Defendant Jreissati and others, ordered Mr. Samaha's interrogation at the ISF facility. Having received such a mandate from Jreissati, Macaron, together with Alexander Mansour, directed Captain Ahmad Sassine to interrogate Mrs. Samaha. Consequently, the ISF officers next brought her to be interrogated by Sassine of the ISF. Sassine interrogated Mrs. Samaha about the U.S. Lawsuit. Sassine's questioning continued for more than six hours. During this time, Sassine asked Mrs. Samaha only about the U.S. Lawsuit and Mrs. Samaha's related claims in Lebanon.

44.     Throughout the interrogation, Macaron and Alexander Mansour stood outside the interrogation room, where they directed Sassine to humiliate Mrs. Samaha, to interrogate her, and to hold her captive until she dismissed the U.S. Lawsuit.

To ensure that the message was fully understood, Macaron contacted Lorne Berkeley, Mrs. Samaha's attorney in the U.S. Lawsuit, and sent him a WhatsApp message informing him that "I am the person who's in charge of the case and pls I will send you an what's up text to be added to finalize the case of Lara and Elie so they can be released." Defendants prohibited Mrs. Samaha from communicating with anyone, including her attorney.

45.    Sassine informed Mrs. Samaha that she would continue to be held in a small cage and only released from captivity after she dismissed the U.S. Lawsuit. Mrs. Samaha initially refused. Sassine responded that, if she continued to refuse, she would remain imprisoned indefinitely.

46.    Defendants were determined to break Mrs. Samaha's resolve, and they determined to inflict additional pain and humiliation to extort her compliance. After Mrs. Samaha initially refused to dismiss the U.S. Lawsuit, Bassil and Germanos ordered Brigadier General Khaled Hammoud, head of the ISF's Information Branch, to hold her in more severe conditions: specifically, in an underground holding cell where the ISF held high-value prisoners, such as members of the Islamic State of Iraq and ash-Sham ("ISIS"), and al-Qa'ida, as well as Hannibal Muammar Gaddafi, the son of deposed Libyan leader Muammar Gaddafi. Bassil further ordered that Mrs. Samaha be physically tortured so that she would dismiss the U.S. Lawsuit. Mrs. Samaha was accordingly placed in an underground cell with no light, windows, or air circulation, and was not provided food or water. She was held there for two days.

47.     Guards threatened to place Mrs. Samaha in a cell along with a woman who had murdered numerous people. They repeatedly told Mrs. Samaha about the woman's murderous acts, in an effort to coerce her into dismissing the U.S. Lawsuit.

48.     The next morning, ISF guards again subjected Mrs. Samaha to psychological torture. They took one of the terrorists out of his holding cell and brought him in front of Mrs. Samaha, where they physically tortured him by stretching his arms and legs in front and behind him. They beat him, threatened to snap his neck, and then repeated the beatings over and over, forcing Mrs. Samaha to watch. Defendants arranged this demonstration to convey to Mrs. Samaha what would happen to her if she refused to comply with their demands.

49.     After torturing other prisoners in front of Mrs. Samaha, the guards waited a few hours. They then brought Mrs. Samaha to a room, where Sassine told her again to dismiss the U.S. Lawsuit. Mrs. Samaha again refused.

50.     At no time during Mrs. Samaha's detention did anyone ever raise the issue of any claims pending against her in Lebanon, including alleged claims for defamation.

51.     At no time was there any lawful basis for Mrs. Samaha's detention.

**c.  Defendants Kidnap Mr. Samaha in a Further Effort to Extort Dismissal of the U.S. Lawsuit.**

52.     After Mrs. Samaha was kidnapped on April 2, 2019, Mr. Samaha immediately went to the couple's home in Beirut. The next morning, he contacted Lebanese Justice Minister Albert Serhan to request his wife's release. Serhan spoke with Bouez and then summoned Mr. Samaha for a face-to-face meeting. During their meeting, Serhan called Ziad Abo Haidar, the Public Prosecutor with jurisdiction over all Beirut

14

prosecutions, who told Mr. Samaha that his wife would be released only if Mrs. Samaha dismissed the U.S. Lawsuit.

53.     Mr. Samaha also contacted Claudine Aoun, the daughter of Lebanon's President, to seek his wife's release. Shortly after that conversation, Mr. Samaha received an instruction from the ISF to meet at ISF headquarters the next day to discuss his wife's detention.

54.     On April 4, 2019, Mr. Samaha went to ISF headquarters. When he arrived at the ISF facility, he was immediately detained without charges of any kind. Sassine confiscated Mr. Samaha's mobile phone, preventing him from communicating with anyone. At Sassine's direction, ISF guards then took Mr. Samaha underground, where he was detained alongside Mrs. Samaha. He too was held with no access to light, food, water, or toilet facilities. Without access to food or water, Mr. Samaha's blood pressure dropped, and he lost consciousness on several occasions. Defendants prevented him from receiving adequate medical attention, for fear that he might contact the U.S. Embassy in Beirut and expose Defendants' scheme.

55.     In addition to the physical pain, Defendants knew that Mr. Samaha's detention would inflict extreme mental distress. Mr. Samaha's father was murdered in the family's home in Beirut in 1992. He was killed in retaliation for Plaintiff Elie Samaha's role as an outspoken political activist critical of the Lebanese Government. No investigation of the murder was undertaken. Instead, to punish Mr. Samaha's persistence in seeking an investigation of his father's murder, the government arrested Mr. Samaha and took him to the ISF detention center (the same detention center to which he was taken in April 2019). Mr. Samaha was tortured there for three days on that

occasion in the early 1990s. Defendants knew of Mr. Samaha's prior torture at the hands

of the Lebanese Government and sought to force him to relive that experience by

detaining him again in the facility and under similar conditions.

56.     Each Defendant knew of and intended that Plaintiffs be imprisoned

under such inhumane conditions. In particular, Bassil closely monitored the conditions of

Plaintiffs' captivity. Indeed, he expressed disappointment and surprise that the conditions

of Plaintiffs' detention were not even worse. He instructed that vermin and bugs be

placed in their cells and that guards physically assault them.

57.     At no time was there any lawful basis for Mr. Samaha's detention.

**d.   Through Continued Torture, Defendants Finally Succeed in Extorting Dismissal of the U.S. Lawsuit.**

58.     As a result of a directive from Bassil, Defendants remained

steadfast in their determination that Plaintiffs would not be released until Mrs. Samaha

dismissed the U.S. Lawsuit.

59.     After Plaintiffs' repeated refusals to accede to Defendants'

demands, Defendants took more extreme measures to coerce Plaintiffs to dismiss the U.S.

Lawsuit. On the morning of April 5, 2019, Plaintiffs were brought to an interrogation

room and ordered to dismiss the litigation. When they again refused, Defendants

threatened to kidnap and physically torture Plaintiffs' daughter, who had traveled to

Lebanon with them.

60.     Based on the torture they suffered and the added threats directed at

their daughter, Plaintiffs finally succumbed to Defendants' extortion. On April 5, 2019,

Mrs. Samaha's attorney, Lorne Berkeley, filed a notice of voluntarily dismissal of the

U.S. Lawsuit. [ECF No. 81].

61.     After the dismissal, Defendants discussed what to do with Plaintiffs. Despite the fact that Plaintiffs had finally succumbed to Defendants' extortion, Bouez considered additional steps to punish and intimidate them, including lengthy imprisonment or execution.

62.     Bouez decided that Plaintiffs should be sent to a military prison for further detention in order to preclude further efforts by Plaintiffs to vindicate their rights and to prevent Plaintiffs from publicizing what had happened to them. To effectuate the transfer, Ziad Abo Haidar contacted military prosecutor Peter Germanos. Germanos agreed to effectuate the transfer because he had been directed by Bassil and Jreissati to do so.

63.     However, General Hammoud subsequently learned of the transfer. Gen. Hammoud also learned of the Defendants' intention to unlawfully detain and perhaps execute the Plaintiffs. The Lebanese Government Defendants were using their official authority improperly, and Gen. Hammoud knew it. Recognizing that Plaintiffs were Americans, Gen. Hammoud instructed that Plaintiffs be returned to ISF custody immediately so that they would not be physically harmed by government officials acting beyond their authority.

64.     Military guards transported Plaintiffs to an ISF facility, where they were brought into an interrogation room and, subsequently, to General Hammoud's office. General Hammoud informed Plaintiffs that a court order to detain them had been issued, but that the order was unreasonable and contrary to law. Consequently, General Hammoud suggested that Plaintiffs immediately and urgently call the United States Embassy in Beirut to explain the situation. General Hammoud said that he would keep

Plaintiffs in ISF custody, because Bassil and Germanos had ordered that Plaintiffs be taken to be killed, and Gen. Hammoud believed that if he released them to the custody of others, those orders would be implemented.

65.     The dismissal of the U.S. Lawsuit was not, however, enough for Defendants. They demanded that Plaintiffs' attorney, Lorne Berkeley, send Macaron a letter waiving Mrs. Samaha's claims against Defendants before Plaintiffs would be released. Macaron sent a message to Mr. Berkeley, stating that he was "the lawyer of the sister and brother and mother of Lara[;] I am the person who's in charge of the case and pls I will send you an what's up text to be added to finalize the case of Lara and Elie so they can be released." Macaron said that various steps would need to be taken so that "the release [sic] can be done." Specifically, Macaron demanded that the dismissal of the U.S. Lawsuit be "with prejudice." In response, Mr. Berkeley sent the letter demanded by Macaron, which reflected that it was being provided as a condition of Plaintiffs' release.

66.     Plaintiffs were released only after Macaron received the letter from Mr. Berkeley. While they awaited their release, Plaintiffs continued to be subject to harsh conditions of confinement.

67.     On April 11, 2019, Judge Farid Ajib conducted a hearing, after which Ajib issued a decision ordering the release of Mr. and Mrs. Samaha. Judge Farid Ajib required proof that the U.S. Lawsuit had been dismissed with prejudice, and that the Lebanese inheritance case had been dismissed. Recognizing their own misconduct, Defendants prevented the hearing from appearing on the public docket to avoid public scrutiny of the kidnapping and torture.

68.     Fearing Plaintiffs' imminent release, that same day, Germanos served a complaint on General Hammoud seeking to prevent him from releasing Plaintiffs. The complaint did not, however, dissuade General Hammoud from releasing Plaintiffs.

69.     On April 11, 2019, Plaintiffs were released from the ISF detention center. Plaintiffs spent approximately four or five hours overnight in their home in Beirut, and then were escorted to the airport by ISF agents. Plaintiffs returned to the United States on April 12, 2019.

70.     Despite Plaintiffs' release, the effects of their torture persist, to the point that every time a door opens or a lock turns, they suffer from uncontrollable panic.

71.     On January 9, 2020 Magistrate Judge Alicia M. Otazo-Reyes issued a Report and Recommendation finding that the dismissal of the U.S. Lawsuit was "a product of duress and coercion." Report and Recommendation at 16. [ECF No. 132]. The Court subsequently adopted the Report and Recommendation and expressly reaffirmed that finding. May 27, 2020 Order at 2. [ECF No. 140]. Recognizing that Mrs. Samaha's dismissal of the U.S. Lawsuit was coerced by  "kidnapping, harsh interrogation, and cruel torture-like tactics," the Court set aside the dismissal and reopened this case on May 27, 2020. *Id*. at 2, 7.

### e.   <u>The Torture Convention</u>

72.     The United Nations adopted the Torture Convention via United Nations Resolution No. 39/46 in 1984. The Torture Convention entered into force June 26, 1987, and recognizes international norms prohibiting the torture of all persons. The Torture Convention remains open to all member States of the United Nations for signature, and as of April 1, 2019, 171 countries, including the United States and

Lebanon, were parties to the Convention; and as of the date of this Supplemental

Complaint, 174 countries are parties. The United States signed the Torture Convention as

a United Nations member State on April 18, 1988, and ratified it on October 21, 1994.

Lebanon acceded[3] to the Torture Convention as a United Nations member State on

October 5, 2000. At all relevant times in this case, the United States and Lebanon were

and are signatories to the Torture Convention.

   73. The Torture Convention imposes legal obligations on parties to

enact implementing laws and regulations. *See* art. 2.

   74. The Torture Convention sets forth specific, well-defined

proscriptions against inflicting severe mental or physical pain. Article 1 provides that:

> "[T]orture" means any act by which severe pain or
> suffering, whether physical or mental, is intentionally
> inflicted on a person for such purposes as obtaining from
> him or a third person information or a confession,
> punishing him for an act he or a third person has committed
> or is suspected of having committed, or intimidating or
> coercing him or a third person, or for any reason based on
> discrimination of any kind, when such pain or suffering is
> inflicted by or at the instigation of or with the consent of a
> public official or other person acting in an official capacity.

   75. The norms contained in the Torture Convention are matters of

mutual concern among nations. The preamble to the Convention recognizes that all

nations have an obligation to promote "universal respect for, and observance of,"

prohibitions against torture. This obligation arises, in part, from Article 55 of the United

---

[3] Lebanon became a party to the Convention after the Convention had already been
negotiated and signed by other states, and it therefore "acceded" to the Convention. It has
the same legal effect as ratification. *See* Arts. 2 (1) (b) and 151, Vienna Convention on
the Law of Treaties 1969.

Nations Charter, which addresses the obligation of the United Nations to promote

"conditions of stability and well-being which are necessary for peaceful and friendly

relations among nations[.]"

**B.** **Defendants' Ultimate Motive for Kidnapping and Torturing Plaintiffs Was to Steal Mrs. Samaha's Lawful Inheritance.**

76.    The Family Defendants conscripted the assistance of the Lebanese

Government Defendants in kidnapping and torturing Plaintiffs because they wanted to

prevent Mrs. Samaha from obtaining her inheritance, either in Lebanon or by using the

U.S. courts. Plaintiffs have been injured not only by their kidnapping and torture, but also

by the Family Defendants' theft of Mrs. Samaha's lawful inheritance.

**a.** **A Multi-Million Dollar Inheritance Left to Mrs. Samaha Leads the Family Defendants to Plot Against Her.**

77.    Plaintiff Lara Samaha is the child of George Mansour and Mona

Mansour. Mrs. Samaha has one brother, Alexander George Mansour, and one sister,

Rolly George Mansour. George Mansour had one sister, Evelyn Mansour.

78.    As a child and young adult, Mrs. Samaha was neglected by her

mother, Mona Mansour, and raised by her paternal aunt Evelyn, who did not have any

children and treated Mrs. Samaha as her own. As Mona Bach Mansour chose to be absent

and neglectful for much of Mrs. Samaha's childhood, Mrs. Samaha spent a considerable

amount of time with Evelyn, who fed her, clothed her, and ensured she received an

education.

79.    Mona Mansour was thirty years younger than her husband,

George, and Mona Mansour was frequently unfaithful to her husband. As a result of this

tension, Evelyn and Mona Mansour did not get along, and Evelyn would often encourage

George to divorce Mona.

21

80.     As Mrs. Samaha approached adolescence, Evelyn continued to care for her. Over time, the disagreements between George and Mona Mansour worsened. Mrs. Samaha's younger siblings, Rolly and Alexander, would side with their mother, Mona Mansour. Mrs. Samaha, who was raised by her aunt Evelyn, would side with her father. As a result, Mona Mansour treated Mrs. Samaha so poorly, and differently from her other children, that Mrs. Samaha, at one time, sought out her birth certificate to determine if Mona Mansour was her biological mother. This division between the family only grew wider over time.

81.     In 1963, George Mansour founded the World Trade Guide and the Arab Trade Directory, businesses that published telephone listing and "yellow page" type advertisements. Through his business, George Mansour published and distributed the World Trade Directory ("Guide du Commerce Mondial"), a directory that included telephone and address listings for businesses throughout Lebanon, as well as companies in Qatar, Dubai, Saudi Arabia, and Egypt. In addition to this comprehensive listing, the directory also included paid advertisements from businesses. The advertising revenue supported the creation and distribution of the Directory.

82.     Over the years, as the business expanded, George Mansour opened additional business entities. He established the Mono System Agency in 1971, and the Blue Dolphin Advertising Company and World Trade Directory SARL in 1998.

83.     The World Trade Directory commanded revenues in excess of $750,000.00 USD per year. Throughout the operation of the business, the World Trade Directory has generated revenues in excess of $15,000,000.00 USD, and generated

profits of over $12,000.000.00 USD. Because the business did not require significant expenses to operate, it was very profitable.

84.     George Mansour and his sister, Evelyn Mansour, operated World Trade Guide, an advertising company that distributed advertisements throughout Lebanon. George and Evelyn operated this business for over 60 years. During this time, the business grew to be very successful, resulting in net profits of more than $600,000.00 USD per year. Over time, the business accumulated cash holdings of more than $12,000,000.00 USD. The success of the business resulted in both George and Evelyn achieving significant affluence. They used the income they earned from the business to purchase personal real property in Lebanon. Both George and Evelyn purchased significant additional real estate, but the identities of those properties remain unknown because Claudine Aoun—the daughter of the President of Lebanon and sister of Chantal Aoun, wife of Bassil—and Salim Jreissati, the First Assistant to the Minister of Lebanon Foreign Affairs, have actively prevented the Lebanese courts from investigating such ownership.

85.     In addition to land that George and Evelyn purchased throughout their lives from the success they enjoyed in their businesses, each inherited from their father separate real property. From his father, George inherited real property valued at more than $1,700,000.00 USD. From her father, Evelyn inherited real property valued at approximately $949,000.00 USD. The total value and the identities of the properties inherited by George and Evelyn remain unknown. Plaintiffs have sought the aid of the Lebanese judicial system to investigate the identities of each of these properties, but

Claudine Aoun and Salim Jreissati have actively prevented the Lebanese courts from investigating such ownership.

86.     Together the financial assets and real property that Plaintiffs have been able to identify that belonged to George and Evelyn are worth more than $17,500,000.00 USD.

87.     Mr. and Mrs. Samaha lived in Lebanon from 1994 until 2013. From approximately 1994-2013, Mr. Samaha operated a clothing distribution business. The business is valued at between $2,000,000.00 USD and $3,000,000.00 USD.

88.     In 2013, Mr. and Mrs. Samaha permanently moved to the United States. After moving to the United States, Mrs. Samaha's already very strained relationship with her family worsened, and over time she grew completely apart from her family members who remained in Lebanon.

      a.   **Evelyn Mansour Leaves Her Entire Estate to Mrs. Samaha; George Mansour Allows One-Quarter of His Estate to Pass to Mrs. Samaha Under Lebanese Intestacy Law.**

89.     On December 18, 1977, Evelyn Mansour signed her Last Will and Testament ("First Will"). Evelyn's First Will directed that all assets of her estate were to be distributed to her brother, George Mansour.

90.     In the intervening years, as tensions grew between George and Mona Mansour, Evelyn decided that she would prefer to leave her estate to Mrs. Samaha, whom she had raised from childhood, in order to ensure the eventual distribution of her assets to someone with whom she had a close connection.

91.     Consequently, Evelyn Mansour prepared a second Last Will and Testament ("Second Will"). Evelyn Mansour executed the Second Will while she was of sound mind and with the intention that she revoke her First Will. The Second Will

24

superseded the First Will. The Second Will named Mrs. Samaha as the sole beneficiary of Evelyn Mansour's estate.

92.     Evelyn Mansour died on August 1, 2013. The Second Will reflected Evelyn Mansour's wishes for the distribution of her estate at the time of her death.

93.     After her death, the Family Defendants wrongfully withheld the Second Will.

94.     Consequently, on August 27, 2014, a Lebanese court probated Evelyn's 37-year-old First Will.

95.     As further detailed below, prior to distribution of the assets of Evelyn's estate, the Family Defendants removed all assets from the estate. Consequently, Mrs. Samaha did not receive any assets from Evelyn's estate.

96.     The removal of the assets from Evelyn's estate was contrary to Evelyn's directions, was contrary to law, and was done with the intent to unlawfully deprive Mrs. Samaha of her rightful inheritance.

97.     George Mansour died on September 20, 2014. The cause of his death was leukemia.

98.     At the time of his death, George Mansour had no will.

99.     Under Lebanese law, the estate of George Mansour was to be distributed with one quarter to his wife, Mona Mansour, and one quarter to each of his three children, Plaintiff Lara Samaha, Alexander George Mansour, and Rolly George Mansour.

**b.  The Family Defendants Scheme to Unlawfully Deprive Evelyn and George Mansour of Their Property**

100.    In the years preceding her father's death, the relationship between Mrs. Samaha and her family had grown increasingly strained. After George Mansour was diagnosed with cancer, he became increasingly ill. Mrs. Samaha sought to aid her father, but because she lived in the United States, she had to rely on the Family Defendants to care for him. Despite Mrs. Samaha's pleas, Defendants refused to provide adequate medical care to George Mansour. Even in death, the Family Defendants showed their disdain for George Mansour, leaving him to be buried in an unmarked grave in a potter's field.

101.    As tensions among the family increased, Mrs. Samaha's mother, brother, and sister determined that Mrs. Samaha should not inherit any of her father's estate or that of her aunt. Mrs. Samaha's father and aunt did not agree with this plan, however.

102.    To evade George and Evelyn Mansour's wishes, the Family Defendants concocted a scheme to remove assets from George and Evelyn Mansour's estates and deprive Mrs. Samaha of her rightful inheritance.

103.    In order to remove assets from George and Evelyn Mansour's estates, the Family Defendants deceived George and Evelyn Mansour into executing a number of real estate transactions to diminish the value of their estates.

a.  On May 5, 2009, George Mansour sold 4% of a property located at 1451 Zahle to Mona Mansour. This share of the property was worth $210,000.00 USD.

b.  On June 9, 2010, Evelyn Mansour sold 5.4% of the property located at 1451 Zahle to Ali Ahmad Bou Hamdon. This share of the property was worth $285,000.00 USD.

c.  On April 16, 2011, Evelyn Mansour sold 5.8% of the property located at 1451 Zahle to Marlene Layoun and Fadi Wadih Layoun. This share of the property was worth $315,000.00 USD.

d.  On October 1, 2011, George Mansour sold 5.4% of the property located at 1451 Zahle to Jamil Noureddine. This share of the property was worth $292,500.00 USD.

e.  On February 24, 2012, George Mansour sold 8% of the property located at 1451 Zahle to Mona Mansour. This share of the property was worth $485,000.00 USD.

f.  On November 3, 2012, George Mansour sold 5.4% of the property located at 1451 Zahle to Mohamad Ali Barbar. This share of the property was worth $325,000.00 USD.

g.  On November 3, 2012, George Mansour sold 6.7% of the property located at 1451 Zahle to Defendant Mona Mansour. This share of the property was worth $400,000.00 USD.

h.  On May 25, 2013, Evelyn Mansour sold 5.8% of the property to Amira Ahmad Maarabouni. This share of the property was worth $350,000.00 USD.

104.    Once these property sales occurred, the Family Defendants did not remit the proceeds of the sale to George and Evelyn's bank accounts. Instead, they misappropriated the proceeds for themselves.

105.    Additionally, in 2011, George Mansour suffered from an accident that impaired his ability to manage his business. In light of this injury, the Family Defendants created a new legal entity in June 2011, Gravity Zero SARL ("Gravity Zero"). Gravity Zero was controlled by the Family Defendants. Gravity Zero was one shell company used by the Family Defendants to misappropriate assets from George Mansour. Defendants transferred property, funds, and business assets from the legitimate business entities that George Mansour had established into Gravity Zero, a holding company created for the sole purpose of moving George Mansour's assets under the Family Defendants' control. Once the transfer of assets to Gravity Zero was complete, the Family Defendants closed George Mansour's other business so that all future earnings would be held by this new company. These transactions were all taken without the approval of George Mansour and were contrary to his wishes.

106.    Beginning around 2013, Mona Mansour began moving additional assets out of George Mansour's name in earnest. She then titled the property solely in her own name. After the transactions were completed, however, she continued to use the funds that paid for the properties to support shared household expenses for herself and her husband.

107.    On September 15, 2014, George Mansour was admitted to Al-Makassed Philanthropic Hospital, where he experienced symptoms including fever, weight loss, fatigue, and dyspnea. At the hospital, he was diagnosed with acute

myelomonocytic leukemia. George Mansour was discharged from the hospital on
September 16, 2014, to spend his last days at home with his family. Upon his discharge
from the hospital, George Mansour suffered from acute anemia and blood thinning,
which caused him to experience a loss of his physical and mental capacities, as well as
dizziness and incoherent speech resulting from impaired cognitive function. Despite the
increasing severity of his symptoms, the Family Defendants prevented George Mansour
from receiving treatment.

108.   These symptoms were consistent with those of acute
myelomonocytic leukemia, which include fatigue, easy bruising, abnormal bleeding,
anemia, thrombocytopenia, dyspnea, slurred speech, headache, confusion, weakness on
one side of the body, and sleepiness.

109.   On September 17, 2014 — just before the death of George
Mansour, while he was at home suffering from his last fight with stage IV leukemia —
the Family Defendants fabricated a power of attorney purporting to allow Mona Mansour
to control all money and property owned by George Mansour. At the time, George
Mansour was 83 years old and overcome by a fever and general fatigue with heavy
dyspnea. As a result of these final symptoms, he was completely incapable of caring for
himself and his physicians determined that he was afflicted with severe mental confusion.

110.   George Mansour did not sign the power of attorney. Instead, Mona
Bach Mansour signed it. The power of attorney purported to include George Mansour's
full signature, but he did not know how to sign his name. The Family Defendants used
their connections to obtain a fraudulent notarial certification that indicated that George
Mansour had appeared in the notary's presence to sign the document, even though he

could not travel outside the house in the days leading to his death after his return from the

hospital. The notary falsely attested that George Mansour was in good health, even

though he was bedridden and had only a few days to live.

111.   The Family Defendants utilized this forged power of attorney to

loot George Mansour's bank accounts. Specifically, just before George Mansour's death,

Mona Mansour used the power of attorney to withdraw $30,000.00 USD from one of his

accounts in a single transaction.

112.   Mona Mansour continued withdrawing funds from George

Mansour's accounts through the time of his death.

113.   When the administration of George Mansour's estate was opened,

it was found that his estate had no assets, despite the substantial wealth he had

accumulated over his lifetime. At the time of his death, George Mansour owned one bank

account, at Audi Bank, with a balance of less than $100.00 USD.

114.   When the administration of Evelyn Mansour's estate was opened,

it was found that her estate had no assets, despite the substantial wealth she he

accumulated over her lifetime. At the time of her death, Evelyn Mansour owned one bank

account with a balance of $33,800 USD.

115.   As a result of the Family Defendants' fraudulent misappropriation

of assets from the estates of George and Evelyn Mansour, Mrs. Samaha was unlawfully

deprived of her rightful inheritance.

c.   **Mrs. Samaha Seeks to Recover Assets Unlawfully Stolen from the
        Estates of George and Evelyn Mansour.**

116.   In order to redress the Family Defendants' theft of George and

Evelyn Mansour's property, Mrs. Samaha demanded that the Family Defendants return

the stolen assets to the estate of George Mansour. Despite repeated demands, the Family Defendants refused to return any of the stolen assets.

117. Because of the Family Defendants' refusal to return the stolen assets, Mrs. Samaha reported the Family Defendants' theft to Lebanese authorities. However, her efforts were fruitless because of Defendants actions to pervert her attempts to obtain justice.

118. The Family Defendants knew that their actions would unlawfully deprive Mrs. Samaha of her lawful inheritance. They also knew that if they were caught, they would be held accountable for their actions, have to make restitution of her share of the estate, and potentially face criminal charges for forgery, embezzlement, and money laundering. Consequently, Alexander Mansour destroyed all bank and other financial account records to prevent Mrs. Samaha from ever learning what assets the Family Defendants had sold and at what price. Despite multiple judicial hearings on the issue, Alexander Mansour was never ordered to disclose where the proceeds of over $15,000,000.00 USD had gone.

119. Not only did Alexander Mansour destroy original financial records, but Salim Jreissati and Gebran Bassil, using their power and position, also directed banks in Lebanon to refuse any requests from Plaintiffs for bank records. Consequently, when Plaintiffs have sought records from the banks directly in an effort to prove their claims, they have been completely rebuffed.

120. Because of Plaintiffs' persistence, on June 16, 2015, Mrs. Samaha filed a criminal complaint in Lebanon against the Family Defendants, and on October 8, 2015, with the Public Prosecutor. Mount Lebanon prosecutor, Dany Charabieh agreed

with the allegations of Mrs. Samaha and filed charges against the Family Defendants for

theft, embezzlement, and forgery. The prosecutor requested that the Family Defendants

be brought to trial. In connection with this investigation, the prosecutor asked the

presiding judge to pursue the investigation, but Jreissati reassigned the investigation to

Mekanna. However, Mekanna owes his loyalty not to the unbiased administration of

justice, but rather to Defendants Jreissati and Bassil. Claudine Aoun, using her power as

the President's daughter, directed Jreissati to stop the progress of the investigation and

prevent the arrest of Mona Mansour. Jreissati did so. Consequently, despite the merit of

Mrs. Samaha's claims, Mekanna has not taken any efforts for over two years to allow

investigation of the Family Defendants.

        121.    Furthermore, the Family Defendants have bribed Jreissati to ensure

his continued loyalty. The Family Defendants have paid Jreissati over $500,000.00 USD

in bribes. Consequently, he has interfered with Plaintiffs' pursuit of justice in Lebanon.

Jreissati threatened prosecutors and judges with dismissal from their posts if they did not

prevent the prosecution of Mrs. Samaha's lawsuit. He specifically directed prosecutor

Samir Hamoud to prevent detectives from investigating the Plaintiff's claims related to

the estate of George and Evelyn Mansour. As a result, no investigation has been

performed into the allegations against the Family Defendants.

    **d.  <u>Defendants Intimidate Mr. and Mrs. Samaha So That Mrs.
        Samaha Will Abandon Her Claims to Her Inheritance.</u>**

        122.    Defendants' actions to prevent Plaintiffs from achieving justice in

Lebanon were not enough however. In addition to preventing the investigation of

Plaintiffs' claims, Defendants orchestrated a campaign of criminal acts to intimidate

Plaintiffs and dissuade them from their pursuit of their legal rights.

123.     Lebanese Prosecutor Ziad Abo Haidar filed charges against Mrs. Samaha in May 2017 to intimidate her into declining to pursue her claims. In response to the U.S. Lawsuit, the Lebanese Ministry of Justice issued a summons commanding Mrs. Samaha to appear to defend those claims in July 2017. Abo Haidar requested the arrest and torture of Mrs. Samaha in 2017.

124.     In response to Mrs. Samaha's efforts to seek vindication of her legal rights in the United States and as part of strategic campaign of intimidation, Mekanna raised allegations against Mrs. Mansour for slander, after which another prosecutor and Defendants brought defamation claims against Mrs. Samaha in Lebanon. On June 12, 2017, Mrs. Samaha was summoned to appear to answer charges of slander brought by Marlene Layoun and Fadi Layoun.

125.     These charges are unfounded and contrary to Lebanese law. Parties are prohibited from bringing a defamation claim based on any statements made in connection with a legitimate legal proceeding.

126.     As a further part of this campaign, Defendants have nullified decisions of unbiased Lebanese judges finding Plaintiffs' claims meritorious. Mona Bach Mansour admitted to Judge Rabih Housami that she had forged the power of attorney. On March 16, 2018, on behalf of General Prosecutor Ghada Aoun, a final recommendation was issued finding that Mrs. Samaha's allegations were meritorious. On behalf of General Prosecutor Aoun, warrants were issued for the arrest of the Family Defendants for forgery, embezzlement, and fraud. However, Jreissati ordered his assistant Pascal Antoun to approach Mekanna to arrange for dismissal of Plaintiffs' action. Jreissati directed the submission of a request to Mekanna to dismiss the case. A few days

thereafter, Mekanna dismissed the case. This dismissal was biased and contrary to law, as recognized in General Prosecutor Aoun's appeal of Mekanna's decision, filed in Lebanon on March 23, 2018.

127.    In addition, Defendants took reprehensible actions to sabotage and interfere with Plaintiffs' business interests in Lebanon in further attempts to intimidate them into silence, and to cease pursuing their claims. In February 2018, Defendants serendipitously decided that Mr. Samaha's business in Lebanon should be shut down. Defendants arranged for a wall of concrete to be poured in front of the entrance of Mr. Samaha's warehouse, essentially creating a tombstone to Plaintiffs' livelihood. Defendants disconnected utility services to the warehouse, leaving the facility with no electricity or ventilation. The concrete wall rendered it impossible to access the main entrance to Mr. Samaha's facility, causing the inability to remove any of the inventory from the warehouse and resulting in the effective closure of his business, exactly as Defendants had intended. These actions rendered inventory valued at $3,000,000.00 USD damaged and unsalvageable.

128.    Plaintiffs reported this conduct to Lebanese officials and filed a corresponding complaint, but Abo Haidar and Dany Macaron, counsel for the Free Patriotic Movement, caused Plaintiffs' complaint to be transferred to Abo Haidar in February 2018. Abo Haidar ensured that no investigation of Defendants' conduct was ever initiated.

**FIRST CAUSE OF ACTION**
**Violation of the Law of Nations**
**(by Lara Samaha against all Defendants)**

129.    Plaintiffs incorporate by reference the allegations set forth above as though fully restated herein.

130.    Mrs. Samaha is an "alien" within the meaning of the ATS.

131.    Defendants knew that Mrs. Samaha had filed the U.S. Lawsuit. Defendants sought to deprive Mrs. Samaha of her valuable right to pursue that litigation.

132.    Defendants did so through violations of the Torture Convention, which is part of the "law of nations" within the meaning of the ATS.

133.    Plaintiffs were kidnapped by the security forces of Lebanon, acting under color of law. Defendants acted, through Jreissati using his actual and/or apparent authority as Minister for Presidential Affairs and former Minister of Justice, to cause the unlawful arrest, detention, and torture of Plaintiffs by Lebanese security forces. While in the custody of the Lebanese security forces, Plaintiffs were subjected to unlawful and severe pain and suffering, both physical and mental.

134.    Defendants willfully and unlawfully deprived Mrs. Samaha of her freedom and tortured her by subjecting her to physical pain and emotional harm, including by threatening her with severe physical pain and death, in order to coerce her into giving up her right to pursue the U.S. Lawsuit.

135.    Torture during unlawful detention constitutes a violation of the law of nations.

136.    Defendants' misconduct touches and concerns the United States because Defendants lured Mrs. Samaha from the United States so that they could kidnap

35

and torture her, and Defendants' misconduct was directed at coercing Mrs. Samaha to abandon a U.S. property interest:  the U.S. Lawsuit.

137.    Defendants are liable to Mrs. Samaha for the harm they inflicted on her through their violation of the law of nations.

## SECOND CAUSE OF ACTION
### Violation of the Torture Victim Protection Act
#### (by all Plaintiffs against all Defendants)

138.    Plaintiffs incorporate by reference the allegations set forth above as though fully restated herein.

139.    Defendants kidnapped and tortured Plaintiffs, including by directing the security forces of Lebanon, acting under color of law. Defendants acted, through Jreissati using his authority as Minister for Presidential Affairs and former Minister of Justice, to cause the unlawful arrest, detention, and torture of Plaintiffs by Lebanese security forces. While in the custody of the Lebanese security forces, Plaintiffs were subjected to unlawful and severe pain and suffering, both physical and mental.

140.    Defendants tortured Plaintiffs to punish them for Mrs. Samaha's efforts to obtain her lawful inheritance and in retribution for Mr. Samaha's complaints about the illegal closure of his business. Defendants also tortured Plaintiffs to intimidate and coerce them so that Mrs. Samaha would dismiss the U.S. Lawsuit.  Defendants tortured Plaintiffs, as that term is defined in the Torture Victim Protection Act.

141.    Plaintiffs were subjected to severe mental pain resulting from the threatened infliction of severe physical pain and imminent death to himself and to his wife.

36

142.    Plaintiffs have no adequate remedies available to them in Lebanon. Defendants are liable to Plaintiffs for the harm they inflicted on him through their violations of Torture Victim Protection Act.

### THIRD CAUSE OF ACTION
**Conversion**
**(by Lara Samaha against Family Defendants)**

143.    Plaintiffs incorporate by reference the allegations set forth above as though fully restated herein.

144.    Plaintiff Lara Samaha was the beneficiary of the estate of her father, George Mansour, and her aunt, Evelyn Mansour. Mrs. Samaha was entitled to an expectancy of receiving an inheritance from their estates upon their deaths. Such an expectancy was Mrs. Samaha's property.

145.    The Family Defendants intended to extinguish Mrs. Samaha's claim by tortuously and fraudulently converting the underlying inheritance to their own property.

146.    The Family Defendants did subsequently extinguish Mrs. Samaha's claim by tortuously converting the underlying inheritance.

147.    The Family Defendants had no right to Mrs. Samaha's inheritance.

148.    As a result of the Family Defendants' wrongful conduct, Mrs. Samaha was deprived of her inheritance.

### FOURTH CAUSE OF ACTION
**Fraud**
**(by all Plaintiffs against all Defendants)**

149.    Plaintiffs incorporate by reference the allegations set forth above as though fully restated herein.

150.    Defendants caused Bouez to misrepresent to Plaintiffs that the Family Defendants wished to resolve Mrs. Samaha's inheritance in good faith.

151.    These representations, directed at Plaintiffs in the United States, were false.

152.    Defendants intended that Plaintiffs would rely on Bouez's misrepresentation to cause them to travel to Lebanon.

153.    Plaintiffs relied on the misrepresentations in deciding to travel to Lebanon.

154.    Plaintiffs' reliance on this misrepresentation was reasonable.

155.    As a result of Plaintiffs' reliance on Defendants' misrepresentations, Plaintiffs traveled to Lebanon, where they were kidnapped and tortured, causing them to relinquish Mrs. Samaha's claims to her inheritance.

## FIFTH CAUSE OF ACTION
### Tortious Interference with an Expected Inheritance
### (by Lara Samaha against all Defendants)

156.    Plaintiffs incorporate by reference the allegations set forth above as though fully restated herein.

157.    Plaintiff Lara Samaha was the beneficiary of the estate of her father, George Mansour, and her aunt, Evelyn Mansour. Mrs. Samaha was entitled to an expectancy of receiving an inheritance from their estates upon their deaths.

158.    Defendants intentionally interfered with Mrs. Samaha's expectancy by forging a power of attorney to remove assets from the estate to prevent her from receiving her inheritance.

159.     The Mansours used the forged power of attorney to remove assets from George's estate. The remaining Defendants prevented Mrs. Samaha from recovering any assets that were wrongfully taken from George's estate. All Defendants thereby changed Mrs. Samaha's expectancy in her father's estate.

160.     As a result of the Family Defendants' wrongful conduct, Mrs. Samaha was deprived of her inheritance.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court award a judgment on all claims and award them such damages and compensation, including punitive damages, interest, reasonable attorneys' fees, costs and such other relief as this Court may deem just. An award of punitive damages is appropriate because Defendants' conduct was criminal in nature, dangerous to human life, outrageous, extreme, wanton, willful, and malicious.

## JURY DEMAND

Plaintiffs demand a trial by jury on all causes of action herein.

Dated: October 12, 2020

/s/ Rebecca L. Castaneda
Rebecca L. Castaneda
Florida Bar No. 1007926
The Castaneda Law Firm PLLC
506 N. Armenia Avenue
Tampa, FL 33609-1703
Tel: (813) 694-7780
rc@attorneyrebeccacastaneda.com

/s/ Andrew E. Siegel
Andrew E. Siegel
District of Colombia Bar No. 1029365
Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, D.C. 20001
Tel: (202) 662-6000
asiegel@cov.com

*Attorneys for Plaintiffs*